## In re LEEDY MORTGAGE COMPANY, INC. (Jointly Administered with Phila. Mortgage Trust Bankr. No. 83–03504S Investment Corp. of America Bankr. No. 83–03503S), Debtor.

### Bankruptcy No. 83–03502S.

United States Bankruptcy Court,
E.D. Pennsylvania.

March 21, 1990.

---

David S. Fishbone, Philadelphia, Pa., for trustee.

Mary F. Walrath, Clark Ladner Fortenbaugh & Young, Philadelphia, Pa., for claimants.

Myron A. Bloom, Philadelphia, Pa., for debtor.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

The instant consolidated contested matters are Objections filed by the Trustee of a mortgage service company which is presently a Chapter 7 Debtor mortgage service company to administrative and secured Proofs of Claim filed by lending institutions whose mortgages the Debtor serviced. Applying the precept that preferences or priorities to creditors should be carefully assessed and allowed only when legally or equitably justified, we decline the claimants' requests to (1) allow them, as administrative or any lesser status of claim, recovery of sums which they agreed to advance to the Trustee's Accountant to have him assemble the Debtor's disordered records; or (2) categorize the sums which the Debtor misappropriated from their respective accounts as secured because they should be excluded from property of the Debtor's estate or found to be as funds held in trust. We also find that, since the Trustee's reliable Accountant provided the only testimony as to the amount of the claims, we have no basis to alter the Accountant's bottom-line figures. We therefore conclude that the Claimants are entitled to unsecured claims in the amounts recited by the Accountant, i.e., San Antonio Savings Association (hereinafter "San Antonio")—$5,000; Union Central Life Insurance Co. ("Union")—$8,604.38; and Carteret Savings & Loan Association ("Carteret")—$15,945.16 (collectively San Antonio, Union, and Carteret are referred to as "the Claimants").

### B. UNDERLYING FACTS

A general history of this case and a description of the pervasive pre-petition improprieties by the Debtor are set forth in a previous Opinion of July 24, 1987, granting in part and denying in part the defendants' motion for summary judgment in a suit by the Trustee against underwriters on fidelity bonds covering certain high-level employees of the Debtor, *In re Leedy Mortgage Co.*, 76 B.R. 440, 441–44, 451–59 (Bankr.E.D.Pa.1987). The case was converted to Chapter 7 on August 10, 1988, with JOHN P. JUDGE, the Chapter 11 Trustee appointed on September 16, 1983 ("the Trustee"), remaining as Chapter 7 Trustee. At a hearing on a motion filed September 29, 1989, by the United States Trustee to remove the Trustee for cause for delaying completion of administration of the estate, an Order was entered, on November 1, 1989, requiring the Trustee to file all appropriate Objections to Proofs of Claim on or before November 22, 1989. Among the filings on November 22, 1989, pursuant to that Order, were Objections to the following Proofs of Claim, all of which had been filed on behalf of the Claimants by the same counsel on August 7, 1985:

| Claim No. | Claimant | Amount (Status) | Basis |
|---|---|---|---|
| 123 | San Antonio | $ 1,731.28 (Administrative) | Share of expenses paid to Accountant |
| 124 | San Antonio | $15,465.59 (Secured) | Shortages in accounts and reimbursement for payments to Accountant to service account |

| Claim No. | Claimant | Amount (Status) | Basis |
|---|---|---|---|
| 125 | Union | $ 3,920.31 (Administrative) | Share of expenses paid to Accountant and cost of locating & retrieving loan documentation from Accountant |
| 127 | Cartaret | $ 1,976.86 (Administrative) | Share of expenses paid to Accountant and cost of locating & retrieving loan documentation from Accountant |
| 128 | Cartaret | $19,914.81 (Secured) | Shortages in accounts and reimbursement for payments to Accountant to service account |

After several continuances, the matters were heard on a must-be-tried basis on February 28, 1990. The only witness at the hearing was George L. Miller, the court-appointed accountant for the Trustee ("the Accountant"). The Claimants and the Trustee submitted Briefs on March 12, 1990, and March 16, 1990, respectively.

The parties basically agree with the following synopsis of the Accountant's testimony included in the Claimants' Brief.

At the time of the filing of its bankruptcy petition, the Debtor was a party to servicing contracts with various mortgagees, including the Claimants. The Debtor had, on occasion, misapplied certain funds of Claimants and other mortgage holders. As the result of a pre-petition Alabama state court action, all mail, including payments sent by mortgagors to the Debtor, was, for an indeterminate time, directed to the court house, resulting in a complete inability of the Debtor to service or post payments submitted to it.

At the time of the appointment of the Trustee, the Debtor had no funds on hand except payments received on account of the mortgages being serviced by it which had been sent to the court house. Under loan agreements with the mortgagees, those funds were to be held in trust by the Debtor and remitted to the mortgagees. The Trustee filed an Application with this court seeking authority to use the trust funds for payment of the Trustee's administrative expenses. Several mortgagees objected to that Application. The ultimate resolution was a Stipulation, Order and Joinder ("the Stipulation") approved by the Bankruptcy Court on or about October 31, 1983, joined by the Claimants, which provided that the Trustee would hire the Accountant, who would reassemble the Debtor's records, with each claimant to pay its pro rata share of these costs as allowed by the bankruptcy court. The Stipulation also provided that the Accountant would turn over to the mortgage holders their respective loan documents and mortgages, as well as all funds in the Trustee's possession posted on account of their respective mortgages. The mortgagees expressly reserved their rights to proceed against the debtor or any other parties arising out of the Debtor's performance of its services.

The final accounting was not submitted to this court by the Accountant until March, 1984, along with a request for compensation of $107,921.85. Individual reconciliation statements were also prepared for each mortgage holder, including the three Claimants, by the Accountant, in which the Debtor's misappropriations of funds in the amounts of $5,000 (San Antonio), $8,604.38 (Union), and $15,945.16 (Cartaret) were recited. No objections were raised to this accounting at that time, although none of

the Claimants affirmatively expressed approval or waiver of disputes of the accuracy of same.

## C. THE CLAIMANTS FAILED TO MEET THEIR BURDEN OF REBUTTING THE TRUSTEE'S EVIDENCE RELATING TO THE VALIDITY AND AMOUNT OF THEIR CLAIMS

■ Since the Trustee presented, through the Accountant, evidence which supported his Objections for the most part, the burden of proving the validity, amount, and proper classification of their claims was clearly thrust upon the Claimants. *See, e.g., In re Railroad Dynamics, Inc.,* 97 B.R. 239, 243–44 (Bankr.E.D.Pa.1989); *In re Franks,* 95 B.R. 346, 350 (Bankr.E.D. Pa.1989); *In re Jordan,* 91 B.R. 673, 682–84 (Bankr.E.D.Pa.1988); *In re Celona,* 90 B.R. 104, 109 (Bankr.E.D.Pa.1988), *aff'd sub nom. Celona v. Equitable National Bank,* 98 B.R. 705 (E.D.Pa.1989); and *In re Lewis,* 80 B.R. 39, 40–41 (Bankr.E.D.Pa. 1987). The Claimants are therefore incorrect when they assert that the presumption of the validity of their Claims arising from Bankruptcy Rule 3001(f) remained intact after the completion of the hearing. *See Celona, supra,* 90 B.R. at 109. Since the Trustee's credible expert was the *only* witness at the hearing, no better than the fifth (both parties appear and present evidence), and arguably the fourth (only the objector appears and presents evidence), of the scenarios set forth in *Lewis, id.* at 41, were presented. The Accountant testified that the Claimants had no basis for asserting administrative or secured status for their claims and reaffirmed that each was entitled to an unsecured claim for the amounts which he calculated that the Debtor had misappropriated from each of them. In the absence of any evidence to the contrary, there is no basis to question the indisputably competent and independent conclusions of the Accountant. We therefore shall allow the Claimants only amounts consistent with the Accountant's testimony.

## D. THE CLAIMS ARE NOT ENTITLED TO ADMINISTRATIVE STATUS BY REASON OF SUBROGATION NOR ON THE GROUND THAT THE CLAIMANTS MADE PAYMENTS TO THE ACCOUNTANT FOR SERVICES WHICH WERE NECESSARY TO PRESERVE THE DEBTOR'S ESTATE

■ The Claimants contend that two types of expenditures should be accorded administrative status: (1) Reimbursement for their pro rata share of the payments for compensation advanced by each of them to the Accountant for assembling the Debtor's records; and (2) Additional costs incurred by Union and Cartaret to retrieve certain documents from the Accountant.

We start from the premises that the focus of 11 U.S.C. § 503(b)(1)(A), which the creditors implicitly invoke as the basis for their contention that certain aspects of their claims are entitled to administrative status, "is upon the *necessity* of the expenses to the *preservation* of the *debtor's estate*" (all but last emphasis in original), and that § 503(b)(1)(A) must be read "narrowly." *In re Grant Broadcasting of Philadelphia, Inc.,* 71 B.R. 891, 897 (Bankr.E.D.Pa.1987). *Accord, In re American Int'l Airways, Inc.,* 77 B.R. 490, 494 (Bankr.E.D.Pa.1987).

■ The Claimants initially attempt to blunt the rather obvious fact that they agreed to make the payments of their respective pro rata shares of the Accountant's compensation and should not now be heard to contend that they have a right of subrogation for same under 11 U.S.C. § 509(a), which provides as follows:

§ 509. Claims of codebtors.

(a) Except as provided in subjection (b) or (c) of this section, an entity that is liable with the debtor on, or that has secured, a claim of a creditor against the debtor, and that pays such claim is subrogated to the rights of such creditor to the extent of such payment.

The Claimants posit the following five criteria must be satisfied in order to allow invocation of § 509(a), all of which they claim to meet:

(1) Payment must have been made by the subrogee to protect his own interest.
(2) The subrogee must not have acted as a volunteer.
(3) The debt paid must be one for which the subrogee was not primarily liable.
(4) The entire debt must have been paid.
(5) Subrogation must not work any injustice to the rights of others.

*In re Trasks' Charolais,* 84 B.R. 646, 648 (Bankr.D.S.D.1988), citing *In re DeSantis & Moore Associates,* 41 B.R. 935, 938 (N.D. Cal.1984); and *In re Flick,* 75 B.R. 204, 206 (Bankr.S.D.Cal.1987).

The Claimants' first burden in their subrogation analysis is to convince us that the mortgagees were liable "with the debtor" in the engagement of the Accountant. They fail in this endeavor. The Debtor had no funds to pay the Accountant. Therefore, the mortgagees expressed their own willingness to pay the Accountant. It was never contemplated that the Debtor could or therefore would pay the Accountant out of its own funds.

Furthermore, it is doubtful that the second, third, and fifth of the five criteria recited in *Trasks' Charolais* are met. The mortgagees offered, as "volunteers" for their own benefit, to compensate the Accountant. If the Debtor is liable to the Accountant at all, its liability was clearly secondary to the mortgagees' liability, arising only if the mortgagees failed to pay. We believe that it would be unjust to tax all other unsecured claimants because a few of the mortgagees have belatedly pursued an attempt to obtain reimbursement for services which they themselves engaged the Accountant to do. *See* page 495 *infra.* We therefore conclude that § 509(a) cannot be invoked to the benefit of the Claimants.

Union and Cartaret presented no evidence that the alleged additional expenses to retrieve documents from the Accountant were actually incurred by them, not to mention for precisely what or why such expenses were incurred. The Accountant testified that he supplied all necessary documents to the Claimants, and that he believed that any such additional expenses were unnecessary. We are therefore left with complete uncertainty regarding the legitimacy of these charges.

The Accountant conceded that the Claimants did pay to him their respective pro rata shares of the cost of his compensation for assembling the Debtor's records. However, the Accountant further testified that he did not perceive how these services benefitted the Debtor, as opposed to the Claimants. By the time that its bankruptcy petition had been filed, the Debtor had been revealed as no longer trustworthy as a servicing agent by any responsible mortgagee, and all of the mortgagees, including the Claimants, withdrew their contracts from the Debtor, some immediately and others in the following months. The servicing contracts yielded the Debtor only about $20,000 monthly in fees when it was servicing a full compliment of mortgagees, and hence it was not worth the Debtor's while to preserve these contracts at a cost to it of almost $108,000. As the Accountant frankly stated, the most economical course for the Debtor to follow would have been to dump the entire bin of payments remitted to the state court in the laps of the Mortgagees and compel them to collectively figure out a way to do the necessary accounting. The Accountant opined that the beneficiaries of the Stipulation pursuant to which he performed the accounting were the mortgagees and that they, rather than the Debtor, championed his undertaking.

The logic of the Accountant's observations causes us to agree, and conclude that the Accountant's services were in no sense necessary for the preservation of the Debtor or its estate. The Debtor's future as a going concern was doomed. If the mortgagees had not put up the funds, these services, which were necessary to preserve the integrity of *their own* accounts, would simply not have been performed. As we view it, the Stipulation represented a direct engagement by the mortgagees to collectively hire the Accountant to perform services for their benefit.

Assuming *arguendo* that we could conclude that the costs incurred by Union and

Cartaret to retrieve documents were actually incurred for purposes which had been made clear to us on the record, as was not the case, we would nevertheless have been compelled to deny these claims as well on the ground that they were necessary to serve only the Claimants' interest, and not those of the Debtor. We will therefore deny all of the Claimants' administrative claims *in toto.*

E. THE CLAIMS FOR SHORTAGES IN ACCOUNTS DO NOT INVOLVE SPECIFIC PROPERTY EXCLUDED FROM THE DEBTOR'S ESTATE NOR PROPERTY TRACEABLE TO A CONSTRUCTIVE TRUST, AND THEREFORE THE CLAIMS ARE NOT ENTITLED TO SECURED STATUS

The Claimants next argue that (1) their claims to recover misappropriations from their respective accounts should be classified as secured, because they represent funds which are, alternatively, not property of the Debtor's estate, pursuant to 11 U.S.C. § 541(d), or are imposed with a constructive trust; and (2) we should modify the Accountant's bottom-line calculation of the misappropriation because their records (unsupported by testimony) are likely to be more accurate than those of the Accountant, who was subject to cross-examination wherein he admitted that he could not be positive that he made all necessary adjustments in making his calculations.

■ We need not tarry long in disposing of the second contention. As in the case of the unproven document-retrieval expenditures, we are compelled to reject positions of the Claimants which, in light of the Accountant's comprehensive calculations, supported by his testimony, have not been proven in any sense inaccurate by the force of any competent evidence. A plaintiff at trial, *see Lewis, supra,* 80 B.R. at 41, could surely not prevail by merely obtaining a concession from the opponent that his calculations could be (but are not believed or shown to be) in error and then presenting, unsupported by evidence at trial, a series of revised calculations. We also note that

the Claimants never objected to the Accountant's work-product when it was presented, and were the only mortgagees, out of a substantial number serviced by the Debtor, to assert any disputes regarding the Accountant's calculations at any time. While not conclusive, these factors are highly suggestive of the figures' basic accuracy. Given the competence and independence of the Accountant, we accept his figures as accurate.

We will, however, allow the Claimants unsecured claims in the amounts recited by the Trustee, even though his figures are different from the amounts claimed, and, in the case of Union, was higher than what was claimed. The Trustee must sink or swim with the Accountant's testimony. We would obviously allow the Claimants to amend their disallowed administrative and secured claims to conform them to our findings. We therefore believe it is just to simply allow the claims in the status and amount supported by the Accountant's testimony.

■ Section 541(d), cited as support for the first alternative argument supporting the Claimants' request for secured status, provides as follows:

(d) Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, *such as a mortgage secured by real property, or an interest in such a mortgage, sold by the debtor but as to which the debtor retains legal title to service or supervise the servicing of such mortgage or interest,* becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold (emphasis added).

This Code section, particularly those portions emphasized above relating to mortgages held by a mortgage-servicing company, such as the Debtor, seem to have some pertinence to the instant matters. However, the issue here is not whether the Trustee is claiming some interest in a mortgage held by the Claimants that the Debtor

is servicing. If that were the issue, § 541(d) would clearly provide that such an interest was not property of the estate. However, that is not an issue in question, and it is therefore unclear what pertinence § 541(d) has at all to the matters at hand.

The Claimants cite five cases interpreting § 541(d) which they contend are pertinent. Three involve claims by investors, as opposed to mortgages, where contracts were serviced by a debtor. *In re Fidelity Standard Mortgage Corp.*, 839 F.2d 1517, 1521 (11th Cir.1988); *In re Atlantic Mortgage Corp.*, 69 B.R. 321, 330 (Bankr.E.D. Mich.1987); and *In re Mortgage Funding, Inc.*, 48 B.R. 152, 155–56 (Bankr.D.Nev. 1985). In *Fidelity Standard*, § 541(d) was held inapplicable because the investor "rolled out" of the mortgages pre-petition. 839 F.2d at 1521–22. This holding does not favor the Claimants' cause. *Atlantic Mortgage* involved only a denial of summary judgment to a trustee who sought to avoid an investor's lien, 69 B.R. at 329–31, and hence is inconclusive. *Mortgage Funding* addressed an investor's § 362(d) motion in support of its attempt to take possession of certain mortgage documents, a clearly inapposite scenario.

The other two cases, *In re Cambridge Mortgage Corp.*, 92 B.R. 145, 146 (Bankr. D.S.C.1988); and *In re Columbia Pacific Mortgage, Inc.*, 20 B.R. 259, 260–61 (Bankr. W.D.Wash.1981), involved the right of a mortgagee to specific funds of the debtor-servicer which were, respectively, in an account at the time of filing (*Cambridge*) and were the proceeds of a sale of mortgaged properties (*Columbia Pacific*).

The instant Trustee is not making claim to any specific property held by the Debtor at the commencement of the case in which the Claimants held an interest. The Claimants, in their statement of facts, admit that the Debtor had no funds except those received from mortgagees that it was servicing. The misappropriated funds were, by the time of the commencement of the case, situated in places unknown. The issue here is not, then, whether specific property held by the Debtor at the time of the filing of the petition belongs to any of the mort-gagees, as in *Cambridge* and *Columbia Pacific*. Section 541(d) is therefore not applicable to the instant matters.

A more plausible but equally unpalatable argument, on the instant facts, is that the Debtor, and the Trustee in his stead, should be charged with a constructive trust as to the funds which the Debtor misappropriated. *See, e.g., In re General Coffee Corp.*, 828 F.2d 699, 701–04 (11th Cir.1987), *cert. denied*, 485 U.S. 1007, 108 S.Ct. 1470, 99 L.Ed.2d 699 (1988); *In re Summit Airlines, Inc.*, 94 B.R. 367, 370–72 (Bankr.E.D. Pa.1988), *aff'd*, 102 B.R. 32 (E.D.Pa.1989); *In re American Int'l Airways, Inc.*, 70 B.R. 102, 104–06 (Bankr.E.D.Pa.1987) (hereinafter cited as "*AIA*"); and *Atlantic Mortgage, supra*, 69 B.R. at 325–31.

A finding that a creditor is the beneficiary of a constructive trust and is thereby entitled to special treatment over and above the normal priority to which its claims would be assigned under the Bankruptcy Code makes bankruptcy courts justifiably wary of identifying property of debtors in bankruptcy as held in constructive trusts. *See, e.g., In re Auto–Train Corp.*, 810 F.2d 270, 273–74 (D.C.Cir.1987); *In re Lewis W. Shurtleff, Inc.*, 778 F.2d 1416, 1419 (9th Cir.1985); *In re Temp–Way Corp.*, 82 B.R. 747, 753 (Bankr.E.D.Pa. 1988); and *AIA, supra*, 70 B.R. at 104–06. It is clear that a constructive trust will never be found, irrespective of the equities of the claimant, if specific funds which have allegedly been misused cannot be traced. *See, e.g., First Federal of Michigan v. Barrow*, 878 F.2d 912, 915–16 (6th Cir.1989); *In re Bullion Reserve of N. America*, 836 F.2d 1214, 1218 (9th Cir. 1988); *Gulf Petroleum, S.A. v. Callazo*, 316 F.2d 257, 261–62 (3d Cir.1963); *Summit Airlines, supra*, 94 B.R. at 371–73; *In re Miller's Auto Supply, Inc.*, 93 B.R. 344, 345 (Bankr.E.D.Pa.1988); *Cambridge, supra*, 92 B.R. at 151; *AIA, supra*, 70 B.R. at 105; and *Atlantic Mortgage, supra*, 69 B.R. at 328–29.

Contrary to the assertion of the Claimants, the funds which the Debtor misappropriated from the Claimants cannot be traced. At the time of the filing of the

petition, the Claimants admit that the Debtor had no funds in hand except those which it properly held for the mortgagees. The misappropriated funds were therefore admittedly dissipated prepetition, and certainly not held or applied in a specific account or place on the date of filing. Tracing can occur only if the allegedly traceable funds are tracked down before they are commingled with other funds and dissipated. The Claimants failed to present any evidence which allowed the tracing of the Funds in issue in the instant matters.

It is true that the Accountant presented plausible hypotheses as to where the dissipated funds might have gone. However, it is clear that the Accountant could not, even several years after the fact and having the experience of considerable litigation over the Debtor's affairs behind him, trace the specific funds misappropriated from the Claimants to any one immediate or ultimate source. Hence, the tracing necessary to permit us to conclude that a constructive trust exists and that the Claimants possess secured claims on account of such a trust cannot be accomplished.

## F.  CONCLUSION

We therefore must disallow the Claimants' attempts to assert administrative or secured claims against the Debtor. We recognize that the Claimants have legitimate claims and we will allow them, with general unsecured status, in the amounts recited by the Accountant at the hearing, despite the Trustee's request, in his Objections, that they be disallowed in their entirety. *See* page 493 *supra.* We also recognize that relegating the Claimants to unsecured status may mean that their claims will go unpaid. However, it must be recalled that the victims of classification of these claims as administrative or secured would not be the undeserving, perfidious Debtor, but other unsecured claimants, equally justified in receiving full compensation of their claims, but which would be merely strung lower on the distributive totem pole by findings in favor of the Claimants.

An Order consistent with this Opinion, allowing the Claimants only unsecured status, will therefore be entered.