### In re PHILADELPHIA MORTGAGE TRUST, Debtor.

#### Bankruptcy No. 83–03504S.

United States Bankruptcy Court, E.D. Pennsylvania.

Aug. 22, 1990.

---

Richard J. Micheel, Brigantine, N.J., objector pro se.

Gene A. Foehl, Media, Pa., for Marie Micheel.

Horace A. Stern, Philadelphia, Pa., for Committee of Equity Security Holders.

James J. O'Connell, Philadelphia, Asst. U.S. trustee.

Dixon R. Rich, Rich, Fluke, Tishman & Rich, Pittsburgh, Pa., for Donald R. Sarp.

David S. Fishbone, Philadelphia, Pa., for trustee.

Marvin, Krasny, Wolf, Block, Schorr & Solis–Cohen, Philadelphia, Pa., for debtor.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

Before us in the above-captioned, long-pending Chapter 11 bankruptcy case are Objections of Richard J. Micheel ("Micheel"), the former President and an alleged creditor of the Debtor, PHILADELPHIA MORTGAGE TRUST ("the Debtor"), to the Third Amended Proof of Claim ("the Fourth Claim"), filed by Donald R. Sarp ("Sarp"). Sarp contends that his claim of $47,326.69 set forth in the Fourth Claim is entitled to administrative expense priority treatment under 11 U.S.C. § 503(b)(1)(A). The Claim consists of sums to which Sarp was allegedly entitled as reimbursement of expenditures made in his capacity as a Trustee of the Debtor under its Trust Agreement ("the Agreement").

We conclude that Sarp is not entitled to assert any claim against the Debtor under the terms of the Agreement. Furthermore, the claim could not, in any event, be deemed an administrative claim for two separate reasons: (1) Sarp has failed to establish that the Debtor's estate benefitted by any obligation to reimburse him; and (2) The claims appear to have arisen pre-petition.

## B. FACTUAL AND PROCEDURAL BACKGROUND

This bankruptcy case was filed with two companion cases, *In re Leedy Mortgage Co.*, Bankr. No. 83–03502S ("*Leedy*"), and *In re Investment Co. of America*, Bankr. No. 83–03503S ("*ICA*"), on September 8, 1983. Some feeling for the history of these cases can be developed by reading our *Leedy* opinions reported at 111 B.R. 488, 489–90 (Bankr.E.D.Pa.1990) ("*Leedy II*") (administrative status denied as to claims of banks who advanced funds to the Trustee's accountant to assemble the Leedy Debtor's disorganized records regarding its mortgage servicing duties for the banks); and 76 B.R. 440, 441–44, 451–59 (Bankr.E. D.Pa.1987) ("*Leedy I*") (summary judgment motion by insurers on the Trustee's claims against fidelity policies covering Leedy's high-level employees, including Micheel, granted in part and denied in part). Suffice it to say that the three related debtors were engaged in gross improprieties which resulted in appointment of separate Trustees in all three cases on September 16, 1983, just eight days after the filing of the cases. *ICA* was converted to a Chapter 7 case on April 6, 1988, and *Leedy* was also so converted on August 10, 1988. Final audit hearings in both cases have been completed, and they will be closed shortly.

This case has survived in Chapter 11. After considerable prodding of the Trustee appointed in this case by this court to proceed with a Plan or allow its conversion, the Trustee, with the Debtor's Committee of Equity Security Holders, filed a joint plan of reorganization which was ultimately confirmed on November 22, 1989.

The instant controversy began on October 18, 1989, when Micheel filed pro se Objections to the third of Sarp's Proofs of Claim, filed, as Claim No. 18, on January 25, 1989, as an administrative claim in the amount of $48,478.04. This claim had been preceded by Sarp's initial claim (No. 9), filed on March 30, 1987, as unsecured in the amount of $41,561.02, and an amended claim (No. 11) on November 16, 1988, in the same amount as the first, but classified as administrative.

The hearing on Micheel's Objections was ultimately continued until January 24, 1990. At that hearing, at which Sarp alone testified, Sarp brandished the Fourth Claim, filed as Claim No. 22 that day. At the close of the hearing, we entered an Order of January 26, 1990, which addressed, *inter alia*, Sarp's claims, by striking the admittedly-superseded Claims No. 9, 11, and 18; requiring Sarp to submit documentation for the legal services for which reimbursement was sought in procedural conformity with *In re Meade Land & Development Co., Inc.*, 527 F.2d 280 (3d Cir.1975); and *In re Mayflower Associates*, 78 B.R. 41 (Bankr.E.D.Pa.1987), on or before March 23, 1990; and allowing any party until April 10, 1990, to submit written responses to Sarp's submissions.

Micheel then proceeded to file, on February 20, 1990, a request that Sarp produce certain additional documents, and on March 16, 1990, a motion to compel responses thereto. On March 29, 1990, we granted Micheel's requests in part; required certain documents to be produced by Sarp by June 1, 1990; and extended the period for response to Sarp's submissions until June 29, 1990. On June 1, 1990, Sarp filed a Fourth Amended Proof of Claim ("the Fifth Claim"). This Claim is identical to the Third except that it appended $10,767.61 for Sarp's costs in prosecuting his various Proofs of Claim, bringing his alleged total claim to $57,483.85. We note that this Claim is not on the court's claim docket, but that there is an additional unsecured Proof of Claim of Sarp (No. 29), filed on March 27, 1990, in the amount of $39,-770.16, on that docket.[1] Micheel filed Objections to the Fourth Amended Proof of Claim, which are listed for a hearing on September 12, 1990. Our Order will dis-

---

1. This Claim is in the amount of the expenses and costs which Sarp alleges arose out of the first suit brought against him by Colonial Bank of Alabama. *See* pages 823, 824 *infra*.

In light of the presence of this claim, the updated Sarp Claim allegedly filed on June 1, 1990, would actually be his *sixth* claim.

pose of all of Sarp's outstanding claims, rendering that hearing unnecessary.

On June 8, 1990, Micheel filed objections to the sufficiency of Sarp's production-request responses, which we sustained in part in an Order of June 28, 1990. In that Order, we also required Sarp to render supplemental responses and allowed him to file a Brief in support of his Claim by July 10, 1990, and extended the period of response until July 31, 1990. In characteristically verbose fashion, Micheel submitted a 41–page Response (not counting hundreds of pages of exhibits attached thereto) to Sarp's own 13-page Brief.

Since the Fifth Claim represents the summation of all that has gone before, we will describe that claim in some detail. Firstly, Sarp claims to have incurred legal fees and expenses in the amount of $39,-770.16 defending himself as a Trustee of the Debtor in a lawsuit commenced in 1983 in the United States District Court for the Northern District of Alabama, Southern Division, encaptioned *Colonial Bank of Alabama, et al. v. Richard J. Micheel, et al.*, Civil Action Nos. CV–83–H–2060–S; and CV–83–P–2002–S ("the First Colonial Action"). Secondly, Sarp claims to have incurred legal fees and expenses in the amount of $4,546.07 in defending himself as a Trustee of the Debtor in a lawsuit commenced in the Court of Common Pleas of Philadelphia County, encaptioned *Touche Ross & Co. v. Richard J. Micheel, et al.*, No. 764, August Term, 1987 ("the Touche Ross Action"). In addition, as indicated previously, Sarp also includes therein legal fees and expenses in the amount of $10,767.61, allegedly incurred in connection with the preparation and submission of his original and amended proofs of claim.

We note at the outset that the sum of separate components of the Fifth Claim, $39,770.16, $4,546.07, and $10,767.62, totals $55,083.85, not the $57,483.85 figure advanced by Sarp. We assume that the $2,400.00 difference is merely the result of an arithmetic error by Sarp and that the actual amount of indebtedness claimed by the Fifth Claim is $55,083.85.

The underlying facts are, to a certain degree, disputed, but the resolution of most, if not all, of these disputes is unnecessary to our disposition. It is undisputed that Micheel and Sarp have been business associates for approximately twenty years. Their principal common venture was the Debtor, a Massachusetts business trust which operated as a real estate investment trust after it was formed in 1972. Sarp was the Debtor's largest shareholder, and Micheel was its President and Chairman of its Board of Directors. Sarp, who is a certified public accountant, became an officer and director of the Debtor in December, 1979.

Micheel was the sole owner of both ICA, a mortgage brokerage service, and Leedy, a mortgage servicing company. Sarp was treasurer and a director of ICA for many years, and served as a director of Leedy from Fall, 1979, to Spring, 1980.

Both Micheel and Sarp attempt to distance themselves from the frauds which engulfed Leedy and the related entities. *See Leedy I*, 76 B.R. at 441–44, 451–59. Sarp characterizes himself as an innocent Board member victimized by Micheel's actions. Micheel, who served a prison term of 2½ years for fraud arising out of certain incidents involving Leedy, characterizes himself as a "fall guy" who did not engage in most of the fraudulent acts but admittedly failed to act to check them. Micheel suggests that Sarp was also well aware of the frauds which transpired and was as guilty as Micheel himself with respect to his failure to check them.

Just before all three bankruptcy filings, on August 31, 1983, Colonial Bank of Alabama ("Colonial") sued Micheel, Leedy, ICA and the Debtor for RICO violations and fraud in the First Colonial Action. The Complaint was amended on September 9, 1983, one day after the Debtor's bankruptcy filing, to add Sarp and the other directors of the Debtor, Leedy, and ICA as defendants. Sarp seeks indemnification of the legal fees and costs of $39,770.16 incurred in defending this action.

Colonial commenced another action against Sarp individually on July 31, 1984,

alleging that Sarp was negligent in rendering professional accounting services to Leedy, ICA, and the Debtor. Sarp does not seek indemnification of legal fees and costs in connection with this action because his defense was supplied by his professional insurer, INAPRO. Both Colonial Actions were settled in consideration for INAPRO's payment of $380,000 to Colonial.

The Touche Ross Action was commenced in 1987, and was an apparent backlash to litigation brought by the Trustee against Touche Ross, which had been the accountant of the Debtor, Leedy, and ICA, for its own negligence in not uncovering the frauds perpetrated. It is not clear what the disposition of this action was, or whether it is still pending, but Sarp requests $4,546.07 for expenses and costs incurred in defending himself in this action.

Sarp bases all of his claim for reimbursement of legal fees and costs upon Section 5.3 of the Agreement, which provides as follows:

> 5.3. *Indemnification of Trustees, etc. The Trust shall indemnify each of its Trustees, officers,* employees and agents (including those who serve at its written request as directors, officers or trustees of another organization in which it has any interest as a shareholder, creditor or otherwise) *against all liabilities and expenses, including amounts paid in satisfaction of judgments, in compromise or as fines and penalties, and counsel fees, reasonably incurred by him in connection with the defense or disposition of any action, suit or other proceeding by the Trust or any other Person, whether civil or criminal, in which he may be involved or with which he may be threatened, while in office or thereafter, by reason of his being or having been such a Trustee, officer, employee or agent, except with respect to any matter as to which he shall have been adjudicated to have acted in bad faith or with willful misconduct or reckless disregard of his duties or gross negligence or not to have acted in good faith in the reasonable belief that his action was in the best interests of the Trust; provided, however, that as to*

> *any matter disposed of by ·a compromise payment by such Trustee, officer, employee or agent, pursuant to a consent decree or otherwise, no indemnification either for said payment or for any other expenses shall be provided unless such compromise shall be approved as in the best interests of the Trust by a majority of the disinterested Trustees or the Trust shall have received a written opinion of independent legal counsel to the effect that such Trustee, officer, employee or agent appears to have acted in good faith in the reasonable belief that his action was in the best interests of the Trust.* The rights accruing to any Trustee, officer, employee or agent under these provisions shall not exclude any other right to which he may be lawfully entitled; provided, however, that no Trustee, officer, employee or agent may satisfy any right of indemnity or reimbursement granted herein or to which he may be otherwise entitled except out of the Trust Property, and no Shareholder shall be personally liable to any Person with respect to any claim for indemnity or reimbursement or otherwise. The Trustees may make advance payments in connection with indemnification under this Section 5.3, provided that the indemnified Trustee, officer, employee or agent shall have given a written understanding to reimburse the Trust in the event it is subsequently determined that he is not entitled to such indemnification (emphasis added).

## C. DISCUSSION

1. Sarp does not have any claim against the estate for indemnification, as he failed to fulfill the requirements for indemnification set forth in paragraph 5.3 of the Agreement.

■ As the emphasized portions of the above Agreement expressly state, indemnification is due to Trustees under the Agreement only in certain circumstances. No indemnification is allowed if the party seeking reimbursement has "been adjudicated to have acted in bad faith or with willful

misconduct or reckless disregard of his duties or [with] gross negligence." Micheel argues that the Complaints in both of the Colonial Actions and the Touche Ross Action did in fact allege bad faith, wilful acts, reckless acts, and gross negligence on the part of Sarp. However, there was clearly no adjudication of this sort of conduct, or in fact of anything, with respect to Sarp, as the Colonial Actions were settled and the disposition of the Touche Ross action is unclear.

Of course, Sarp's insurer made a generous monetary settlement with Colonial, suggesting that the allegations made by the plaintiffs in at least the Colonial Actions were not frivolous. Moreover, since those suits were compromised, it is necessary to carefully examine those provisions of the Agreement setting forth the circumstances under which an officer or director is entitled to reimbursement in the event of a compromise of a lawsuit against a Trustee. The Agreement provides that one of the two alternative conditions must be satisfied. Firstly, the compromise may be approved as in the best interests of the Trust by a majority of the disinterested Trustees; or, secondly, the Trust may receive a written opinion of independent legal counsel to the effect that such Trustee "appears to have acted in good faith in the reasonable belief that his action was in the best interests of the Trust."

Sarp does not deny that he failed to fulfill either of these alternative requirements. However, he argues that he could not possibly meet this first alternative of getting approval of a majority of the Trustees because there has not been a meeting of the Trustees of the Debtor since 1983, due to the presence of the bankruptcy Trustee. He also alleges that no current Trustee of the Debtor has objected to his within claims. These assertions may be true, but they are unavailing as justification for disregarding the terms of the Agreement, which is the fountainhead of Sarp's right to reimbursement in the first

place. We note that Sarp has offered no explanation for his failure to fulfill the second alternative requirement of supplying a written opinion of "independent legal counsel" that he acted in good faith. We are thus left with the distinct impression that no such opinion could be obtained, particularly, again, in light of the willingness of Sarp's insurer to pay $380,000 to extricate him from the lawsuit.

Furthermore, assuming *arguendo* that it would have been impossible for Sarp to have satisfied either of the alternative conditions, which we expressly find is not the case as to the second condition, it does not follow that we should simply eliminate the conditions and allow Sarp to be unconditionally reimbursed for the expenditures incurred in his defense in these compromised actions. Given that the right to reimbursement would not exist but for ¶ 5.3 of the Agreement, we would be inclined to conclude that impossibility of fulfilling the conditions would result in Sarp's right to reimbursement in the event of compromise being eliminated.

Our finding that Sarp has no right to reimbursement eliminates all of his claims, unsecured as well as administrative. However, our research of the applicable law, to which neither party refers in their submissions,[2] convinces us that Sarp had no conceivable basis for making an administrative claim against the estate of the Debtor in this bankruptcy case.

2. The scope of claims allowable as administrative claims, pursuant to 11 U.S.C. § 503(b)(1)(A), is narrowly construed to include only those expenditures which the claimant proves to have significantly benefitted the debtor's estate.

Sarp asserts that he is entitled to an administrative claim on the basis of 11 U.S.C. § 503(b)(1)(A), which provides as follows:

**2.** It is, of course, not surprising that Micheel, a layman, has not provided us with any legal discussion or authorities in his submissions. It is somewhat more surprising to observe this failure on the part of Sarp's counsel, for whose services he has the temerity to demand $10,-767.62.

§ 503. Allowance of administrative expenses.

(b) After notice and a hearing, there shall be allowed administrative expenses, ..., including—

(1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of this case; ...

The generally stated policy of allowing certain claimants to assert claims entitled to administrative priority for services rendered after the commencement of the case is that "the estate as a whole is benefitted if general creditors subordinate their pre-bankruptcy claims in order to secure goods and services necessary to an orderly and economical administration of the estate after the petition is filed." *In re Yermakov*, 718 F.2d 1465, 1470 (9th Cir.1983). *See also In re Christian Life Center*, 821 F.2d 1370, 1373 (9th Cir.1987).

Courts have generally held that "[s]tatutory priorities are to be narrowly construed because the presumption in bankruptcy cases is that the debtor's limited resources be equally distributed among his creditors." *In re Consolidated Oil & Gas, Inc.*, 110 B.R. 535, 537 (Bankr.D.Colo.1990), quoting *In re Amarex*, 853 F.2d 1526, 1530 (10th Cir.1988). *See also, e.g., In re Metro Transportation Co.*, 117 B.R. 143, 154 (Bankr.E.D.Pa.1990), quoting *In re Great Northeastern Lumber & Millwork Corp.*, 64 B.R. 426, 427 (Bankr.E.D.Pa.1986) (GOLDHABER, CH. J.).

In *In re Fred Swain, Inc.*, 97 B.R. 660, 661 (Bankr.S.D.Fla.1989), the court noted that, when considering § 503(b), it is necessary to

begin with the undisputed precept that because the presumption in bankruptcy cases is that the debtor's limited resources will be equally distributed among his creditors, statutory priorities are narrowly construed. *Joint Industry Board v. United States*, 391 U.S. 224, 228 [88 S.Ct. 1491, 1493, 20 L.Ed.2d 546] ... (1968); *In re United Merchants & Manufacturers, Inc.*, 597 F.2d 348, 349

(2d Cir.1979); *In re Mammoth Mart, Inc.*, 536 F.2d 950, 953 (1st Cir.1976). "[I]f one claimant is to be preferred over others, the purpose should be clear from the statute." *Trustees of the Amalgamated Insurance Fund v. McFarlin's, Inc.*, 789 F.2d 98, 100–01 (2d Cir.1986).

*See In re Baldwin–United Corp.*, 43 B.R. 443, 451 (S.D.Ohio 1984), quoting *In re O.P.M. Leasing Services, Inc.*, 23 B.R. 104, 121 (Bankr.S.D.N.Y.1982) (the "actual" and "necessary" provision of the statute "must be narrowly construed, in order to keep fees and administrative expenses at a minimum so as to preserve the estate for the benefit of all creditors"); *In re Moore*, 109 B.R. 777, 780 (Bankr.E.D.Tenn.1989) (bankruptcy courts should strictly scrutinize claims and narrowly construe the terms "actual" and "necessary"); *In re Massetti*, 95 B.R. 360, 363 (Bankr.E.D.Pa.1989) (FOX, J.) (since the allowance of priority claims reduces the amount of the estate's funds available to prepetition creditors, claims constituting administrative expenses are narrowly construed); *In re S.M.B. Holdings, Inc.*, 77 B.R. 29, 32 (Bankr.W.D.Pa. 1987), quoting *In re Cascade Oil Co.*, 51 B.R. 877, 881 (Bankr.D.Kan.1985) (if a priority is granted to a creditor who is not clearly entitled to it, "it dilutes the value of the priority for those creditors Congress intended to prefer"); *In re Patch Graphics*, 58 B.R. 743, 745 (Bankr.W.D.Wis.1986) (since an administrative expense constitutes a priority claim, any recovery must be subject to strict scrutiny by the court; priority statutes are strictly construed); and *In re Grant Broadcasting of Philadelphia, Inc.*, 71 B.R. 891, 897–98 (Bankr.E.D. Pa.1987) (Section 503(b)(1)(A) must be read narrowly; liberal allowances of administrative expenses will exhaust the debtor's scarce resources). *See also, e.g., Leedy II, supra*, 111 B.R. at 491; *In re D.W.G.K. Restaurants, Inc.*, 84 B.R. 684, 689 (Bankr. S.D.Cal.1988); *In re American International Airways, Inc.*, 77 B.R. 490, 494 (Bankr.E.D.Pa.1987); and *In re Rife*, 71 B.R. 129, 131 (Bankr.W.D.Va.1987).

Thus, we can agree with the statement of the court in *In re York International*

*Building, Inc.*, 527 F.2d 1061, 1068 (9th Cir.1975), that

> [e]xtravagant allowance of fees and other costs of administration in bankruptcy estates have long been denounced as "crying evils." *In re Realty Associates Securities Corp. v. O'Connor*, [295 U.S. 295, 299, 55 S.Ct. 663, 665, 79 L.Ed. 1446 (1935)].

■ A creditor's characterization of its claim as an administrative expense entitled to priority is not determinative of the claim's status. Even if no objections to the claimed priority status are raised, the bankruptcy court must determine, in its discretion, the priority of the claim. *Guaranty National Insurance Co. v. Greater Kansas City Transp., Inc.*, 90 B.R. 461, 462–63 (D.Kan.1988). The "burden of proving entitlement to a priority is on the person claiming priority." *Amarex, supra*, 853 F.2d at 1530, quoting *O.P.M. Leasing, supra*, 60 B.R. at 680. *See also Moore, supra*, 109 B.R. at 780 (the burden to demonstrate that the claim is an administrative claim is upon the movant); *Patch Graphics, supra*, 58 B.R. at 745, citing *Woods v. City National Bank & Trust Co.*, 312 U.S. 262, 268, 61 S.Ct. 493, 497, 85 L.Ed. 820 (1941) (the burden of proof is upon the party seeking an administrative claim); and *In re Central Rubber Products, Inc.*, 31 B.R. 865, 870 (Bankr.D.Conn.1983), quoting 3A COLLIER ON BANKRUPTCY, ¶ 64.701, at 2276 (14th ed. 1975) (unlike a general claim, "a claim of priority when alleged does not shift the burden of going forward to an objector thereto, the claimant must introduce proof sustaining his claim to priority"). *See also Consolidated Oil & Gas, supra*, 110 B.R. at 537; *In re Fall*, 93 B.R. 1003, 1012 (Bankr.D.Or.1988); and *D.W.G.K. Restaurants, supra*, 84 B.R. at 689.

The bankruptcy court has considerable discretion in deciding whether to characterize a claim as an administrative expense entitled to the attendant priority provided by § 503(b)(1)(A) or not. *See Baldwin–United, supra*, 43 B.R. at 453 (bankruptcy court has "reasonable discretion" in awarding administrative priority expenses);

*Moore, supra*, 109 B.R. at 780, citing *In re Dakota Industries*, 31 B.R. 23, 26 (Bankr. S.D.D.1983) (the court has broad discretion to determine whether a claim for an administrative expense is, in actuality, an administrative expense); and *Rife, supra*, 71 B.R. at 131 ("while the court has reasonable discretion in interpreting the provisions of § 503, such discretion does not include the power to go beyond the clear intent and well-established construction of the statute"). *See also Guaranty National, supra*, 90 B.R. at 462–63; and *In re Texaco, Inc.*, 90 B.R. 622, 630 (Bankr.S.D. N.Y.1988).

■ Section 503(b)(1)(A), quoted on page 825 *supra*, provides that only "the actual, necessary costs and expenses of preserving the estate" of a debtor are entitled to priority status as administrative expenses. *Mammoth Mart, supra*, is generally cited as establishing the appropriate test for determining entitlement to administrative expense priority. *See Amarex, supra*, 853 F.2d at 1530; *Guaranty National, supra*, 90 B.R. at 463–64; *Consolidated Oil & Gas, supra*, 110 B.R. at 537; *Massetti, supra*, 95 B.R. at 363; and *S.M.B. Holdings, supra*, 77 B.R. at 32. In *Mammoth Mart*, 536 F.2d at 954, the First Circuit Court of Appeals set forth two conditions to be met before a claim is entitled to priority treatment under § 503(b)(1)(A):

> For a claim in its entirety to be entitled to first priority under § 64(a)(1) [§ 503(b)(1)(A)'s predecessor in the Bankruptcy Act], the debt must arise from a transaction with the debtor-in-possession. When a claim is based upon a contract between the debtor and the claimant, the case law teaches that a creditor's right to payment will be afforded first priority only to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of the business.

*Id.* Thus, only an expense that (1) arises from a transaction with the debtor-in-possession; and (2) is beneficial to the debtor-in-possession, that it is eligible for administrative expense priority. *See also Moore,*

*supra,* 109 B.R. at 780, quoting *In re Hendersonville Bowling Center, Inc.,* 65 B.R. 963, 965 (Bankr.M.D.Tenn.1986) (the movant must show "that the expenses were reasonable, necessary and benefitted the estate"); *Leedy II, supra,* 111 B.R. at 491, quoting *Grant Broadcasting, supra,* 71 B.R. at 897 (entitlement to administrative claims focuses upon "the *necessity* of the expenses to the *preservation* of the *debtor's estate* "); and *In re Keegan Utility Contractors, Inc.,* 70 B.R. 87, 89 (Bankr. W.D.N.Y.1987) (only "[t]he actual and necessary expenses of the trustee [or debtor-in-possession] of operating a business, for storage of property, for rent, for taxes and other costs incidental to protection and conservation are contemplated within the phrase 'the actual, necessary costs and expenses of preserving the estate' ", quoting 3 COLLIER ON BANKRUPTCY, ¶ 503.04[1][a][i] (15th ed. 1986)).

■ The status of a claim as post-petition is also a necessary condition for an administrative claim. However, the fact that a claim arises post-petition is not a sufficient condition for a claim to be classified as administrative. A claim is not entitled to priority simply because the right to payment arises after the debtor-in-possession is in place. *Amarex, supra,* 853 F.2d at 1530.

As the foregoing caselaw reveals, § 503(b)(1)(A) has been narrowly construed to authorize a priority for only those post-petition costs and expenses which are "actual" and "necessary" to preserving the estate. The services performed which generated the costs and expenses must benefit the debtor-in-possession and not merely "further the self-interest of the particular claimant." *S.M.B. Holdings, supra,* 77 B.R. at 32. "When a creditor incurs expenses primarily to protect its own interest the creditor is not entitled to a priority administrative claim." *Patch Graphics, supra,* 58 B.R. at 746. *See also Leedy II,* 111 B.R. at 492–93 (costs incurred to benefit the claimants' own interests are not entitled to administrative priority).

Further, the benefit or contribution to the debtor-in-possession from services enti-tled to administrative priority must be substantial, not merely incidental. *Patch Graphics, supra,* 58 B.R. at 746. *See also D.W.G.K. Restaurants, supra,* 84 B.R. at 689; *In re American 3001 Telecommunications, Inc.,* 79 B.R. 271, 273 (Bankr.N.D. Tex.1987); *Grant Broadcasting, supra,* 71 B.R. at 896; *In re The Charter Company,* 52 B.R. 267, 270 (Bankr.M.D.Fla.1985); and *In re Jensen–Farley Pictures, Inc.,* 47 B.R. 557, 569 (Bankr.D.Utah 1985) ("The appropriate test under Section 503(b) is whether the services substantially contributed to successful result, that is, an actual and demonstrable benefit to the debtor's estate, the creditors, and, to the extent relevant, the stockholders (citations omitted).").

3. Claims based upon pre-petition conduct of corporate officers have consistently been disallowed administrative status because administrative claims must arise post-petition.

The body of cases most factually analogous to Sarp's instant claim for indemnification as a Trustee of the Debtor–Trust is a line of cases involving claims of corporate officers for indemnification and compensation for pre-petition actions based upon corporate by-laws or resolutions. Such claims have consistently been denied administrative status due to findings by courts that such claims are pre-petition claims because the acts or services which gave rise to them were performed pre-petition. *See Amarex, supra,* 853 F.2d at 1531; *Christian Life, supra,* 821 F.2d at 1374; *Guaranty National, supra,* 90 B.R. at 464; *Baldwin–United, supra,* 43 B.R. at 454–55; *Consolidated Oil & Gas, supra,* 110 B.R. at 538; and *In re Amfesco Industries, Inc.,* 81 B.R. 777, 780–85 (Bankr.S.D.N.Y.1988).

In *Amarex,* the debtor's general counsel requested that his $10,000.00 salary bonus be given an administrative priority. The court affirmed the bankruptcy court's holding that "only that portion of the bonus attributable to services performed for [the debtor] subsequent to the commencement of Chapter 11 proceedings was entitled to priority." 853 F.2d at 1527. In support of its conclusion, the court stated that

the right to priority does not necessarily depend on the fact that the obligation to pay the bonus did not arise until after the commencement of bankruptcy proceedings. As the cases indicate, what is crucial is what *consideration* supports the bonus, and whether such consideration, or a portion of it, was pre-petition services (emphasis in original).

*Id.* at 1531. In *Amarex*, the court concluded that the claimant earned the bonus throughout the first year of his employment. Accordingly, "only that portion of the bonus attributable to services performed post-petition is entitled to priority of payment as an administrative expense under § 503(b)(1)(A)." *Id.* at 1532.

In *Christian Life*, corporate officers sought administrative expense priority under § 503(b)(3)(D) [3] for legal fees incurred by them in defending allegations of securities violations and fraud. 821 F.2d at 1372. The court denied the officers' request for administrative priority of their claims and explained its conclusion in the following manner:

> A corporation's duty to indemnify its officer, whether conferred by statute or by contract, is a form of compensation for the officer's services. *In re Baldwin–United Corp.*, 43 B.R. 443, 454–56 (S.D. Ohio 1984). [The officer] was sued for his pre-petition actions of setting up and administering the trust fund. Any duty of the [debtor] to reimburse or indemnify [the officer] for his legal expenses arises from these pre-petition services.... [The] legal fees claim arises from [the officer's] pre-petition services to the corporation rather than any post-petition services. Thus [the] claim is at most a general unsecured claim not entitled to administrative priority. (citation omitted). It makes no difference that the duty to indemnify [the officer] for litigation expenses, ..., did not accrue until after the petition was filed when [the officer] incurred those expenses; the

critical fact is that the claim for indemnity arose from pre-petition services [the officer] provided the corporation.

*Id.* at 1374.

The court in *Guaranty National*, 90 B.R. at 463, stated the issue before it as follows: "Are [the claimant's] *post-petition* payments of *pre-petition* claims administrative expenses under section 503(b)(1)(A) (emphasis in original)?" The court responded in the negative, concluding that the claim did not arise post-petition, even though it was paid post-petition. *Id.* at 464.

In *Baldwin–United*, 43 B.R. at 447, the court confronted the following issue: whether indemnification of corporate directors for their legal expenses in defending suits challenging their activities while serving the corporation was entitled to an administrative expense priority. The debtor's corporate by-laws contained an obligation of the corporation to indemnify the directors for expenses incurred in litigation relating to their positions as directors. In rendering its decision, the court found it appropriate to divide the directors into two groups, former directors and present directors.

The court denied administrative priority to the claims of the former officers and directors and pointed out that "the critical fact is that the claim did not arise from a transaction with the debtors-in-possession." *Id.* at 454. The court stated further that

> the obligation to indemnify fully matured pre-petition in that the former officers' and directors' performance under their contracts with the debtors was complete at the time the petitions were filed.

*Id.* at 455. The court found immaterial the fact that the debt owed by virtue of the indemnification clause did not exist, other than as a provision of the by-laws, until post-petition. *Id.*

Similarly, in *Consolidated Oil & Gas*, the bankruptcy court concluded that claims

---

**3.** Section 503(b)(3)(D) provides, in pertinent part, for the allowance, as an administrative expense, of "actual, necessary expenses" incurred by a creditor, an indenture trustee, an equity security holder, or a committee representing creditors other than the official committee of unsecured creditors appointed pursuant to 11 U.S.C. § 1102, in making a "substantial contribution in a case" brought under Chapter 11 of the Bankruptcy Code.

of former officers and directors for indemnification of fees and expenses incurred in defending a mismanagement suit commenced by the debtor post-petition were not entitled to administrative priority, since the officers and directors did not perform any services for the debtor or provide other post-petition consideration. 110 B.R. at 538. The court therefore states, at *id.*, quoting *Amfesco,* 81 B.R. at 784, as follows:

> Although claimants' entitlement to indemnification ... first matured post-petition, their unliquidated, contingent bankruptcy claim arose pre-petition within the meaning of Section 101(4) of the Bankruptcy Code because the threatened litigation was based upon their pre-petition actions as officers and directors of the debtor. Administrative expense priority was therefore denied, because "[a]ny duty of the Debtors to indemnify the Applicants arises from services provided to the pre-petition Corporation not for services rendered post-petition to the Debtors-in-Possession."

The same result was reached in *Amfesco,* in which the bankruptcy court denied administrative expense priority to present and former directors of the debtor for claims seeking indemnification of legal expenses incurred in connection with threatened litigation against them even though the debtor's articles of incorporation included an indemnification clause.

These cases, even when read in conjunction with the Third Circuit's ruling in *In re M. Frenville Co.,* 744 F.2d 332 (3d Cir. 1984), *cert. denied,* 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985),[4] lead us to conclude that Sarp's claims did not arise post-petition. In *Frenville,* the court was called upon to determine when the automatic stay imposed by 11 U.S.C. § 362(a) applied to certain claims. Since the automatic stay only applies to pre-petition claims, the crucial issue was whether the movant's claim was a pre-petition or a post-petition claim. The payments in question were payments for indemnification or contribution. *Id.* at 336.

The answer to this question, according to the Third Circuit, depends upon whether the parties have executed an indemnity agreement. The court concluded that

> [w]hen parties agree in advance that one party will indemnify the other party in the event of a certain occurrence, there exists a right to payment, albeit contingent (footnote omitted), upon the signing of the agreement. *See In re THC Financial Corp.,* 686 F.2d 799, 802–04 (9th Cir.1982); *In re AM Media Properties, Inc.,* 5 B.R. 126, 133 (Bankr.S.D.Tex. 1980), *aff'd,* 646 F.2d 193 (5th Cir.1981).

*Id.* at 336–37.

The parties in *Frenville,* however, had not executed any indemnity agreement. In such a situation, the court concluded, in holding that the stay did not apply, that the indemnification claims were post-petition claims, reasoning that

> a claim for contribution or indemnification does not accrue at the time of the commission of the underlying act, but rather at the time of the payment of the judgment flowing from the act.

*See also Grady v. A. H. Robins Co.,* 839 F.2d 198, 203 (4th Cir.1988) (when the acts constituting the tort or breach of warranty have occurred pre-petition, the claim is a "contingent" one also arising pre-petition).

4. Sarp has not proven that his claim is entitled to administrative status.

■ Beginning with the holdings in the most factually analogous cases, noted in the previous headnote at pages 828–830 *supra,* we are compelled to conclude that, even when applying the holding of *Frenville* to the facts before us, Sarp, because of the indemnity provision in the pre-petition Agreement, does not have a post-petition claim. In such a case, the claim for contribution or indemnity did not arise post-petition, even though Sarp was not joined in any of the three lawsuits for services in which he claims contribution until the day after the Debtor's bankruptcy filing. Therefore, under the holdings of all of the cases cited under that headnote,

4. We make this statement because we are bound by the holding in *Frenville,* and the court, in *Amfesco,* makes considerable efforts to distance itself from the reasoning of *Frenville* in attaining its result. 81 B.R. at 781–83.

Sarp does not have a claim susceptible to priority treatment under § 503(b)(1)(A).

Even were Sarp's claims classifiable as post-petition claims, it seems clear that they would not be entitled to administrative status. The only possible actual benefits received by the Debtor's estate from Sarp at all were derived from his pre-petition services on its behalf. We will not enter the debate between Micheel and Sarp as to who was the more responsible for the downfall of the Debtor, ICA, and Leedy. We only note that it is debatable whether Sarp's services benefitted the Debtor, or contributed to its demise. The important point is that, if there were benefits to the Debtor from his services, it was derived by the Debtor pre-petition.

The only activities which took place post-petition were Sarp's efforts to defend himself from certain claims, which were primarily raised against him personally as opposed to against him solely in his capacity as an officer of the Debtor. The expenditures appear to have been clearly made for Sarp's own benefit, and any benefit to the Debtor's estate appears to have been, at best, incidental.

Furthermore, it must be recalled that Sarp undertook the financing of his defenses in the instant litigation without the benefit of financial assistance from the estate. In making these claims, he is now merely asking the estate to pick up some or all of his bills after the fact. It is very difficult to see how the Debtor's estate would be benefitted by picking up Sarp's bills at this point and reimbursing him for his expenses and costs.

In *Baldwin–United, supra,* the court raised a similar query. It concluded that the only way in which the estate's defraying of the claimants' expenses would "preserve the estate," as required under § 503(b)(1)(A), is that "the estate may ultimately be liable for any judgment entered against the individual defendants" (footnote omitted). 43 B.R. at 455. This prospect does not appear to be possible to be realized here. Neither Colonial nor Touche Ross have made claims against the estate which the estate's payment of Sarp's bill could defray. Furthermore, the *Baldwin–*

*United* court observed that, if judgments were obtained against the directors and officers, the judgment creditors "would have a priority well below all existing creditors and would therefore pose no real threat to the integrity of the estate (footnote omitted)." *Id.* The court thus concluded that the estate would receive no substantial benefits from defraying the expenses and costs of the directors and officers such as would justify an award of administrative priority to such parties under § 503(b)(1)(A). *Id.* at 455–56.

Sarp has not articulated any benefit received by the Debtor's estate from the legal services rendered on his behalf. Moreover, he was clearly an insider of the Debtor. *See* 11 U.S.C. § 101(30)(B)(i), (ii). Any claims of an insider against a debtor would normally be subject to subordination, not prioritization. *See In re Comtec Industries, Inc.,* 91 B.R. 344, 348–49 (Bankr.E.D. Pa.1988).

Therefore, Sarp's claims are not entitled to administrative status, even if they could be classified as post-petition claims and therefore eligible for administrative status. We also note that, if an argument could be made that *Frenville* mandates the conclusion that the claims are post-petition, which we re-emphasize that we reject for the reasons articulated at pages 828–830 *supra,* Sarp would nevertheless be left with only an unsecured, post-petition claim. As such a "claim" is not dischargeable or otherwise affected by a bankruptcy, *cf. In re Adams,* 94 B.R. 838, 850 n. 5 (Bankr.E.D.Pa.1989), such claims are not allowable against the Debtor's estate. Of course, we have concluded that Sarp has no claim against the Debtor's estate, under the terms of the Agreement, in any event. See pages 824–26 *supra.*

D. CONCLUSION: NOT ONLY MUST MICHEEL'S INSTANT OBJECTIONS BE SUSTAINED, BUT ALL OF SARP'S CLAIMS MUST BE STRICKEN AND A BAR DATE MUST BE ESTABLISHED TO PREVENT CONTINUOUS FILINGS OF FUTURE CLAIMS.

The foregoing discussion requires us to sustain Micheel's Objections to Sarp's

Fourth Claim. However, further steps are also in order.

First, we are obliged to strike the Fifth Claim as well. The only distinction between the Fifth Claim and the Fourth Claim is Sarp's attempt to impose his expenses and costs in defending the Fourth Claim against the estate.

The proposed appendage to the Fourth Claim falls of its own weight in light of our conclusion that the Fourth Claim cannot be successfully defended. However, even if the validity of the Fourth Claim were sustained, we would observe that in no sense can it be logically maintained that Sarp's expenditures in defending his own claim benefitted the Debtor's estate. The only case which we could locate where a claimant was so bold as to make such a claim was *Fred Swain, supra*. Although the court *allowed* an administrative claim to the claimant in that case, it denied any appendage to the claim for collection costs in sustaining the claim in the following language, 97 B.R. at 662:

> The omission of any reference in § 503(b) to fees and costs of collecting administrative claims, coupled with the obvious inconsistency of allowing such collection expenses while disallowing penalties and interest, makes it equally clear that there was no intent to accord priority to collection expenses.

> The foregoing analysis is, of course, completely consistent with the Code, which in § 726 permits recovery of penalties, damages, and interest as fourth and fifth priorities, ahead only of payment to the debtor, and *after* all other claims have been fully paid, including claims filed after the bar date.

> It is also completely consistent with § 506(b), which permits the recovery of interest, fees, costs and charges provided for under the parties' agreement; *only* by secured creditors, and then *only to the extent of the collateral.*

> This explicit provision in § 506(b) for recovery by a limited class of creditors

under limited circumstances is an unmistakable indication that such charges are not recoverable by any other claimant in the absence of an equally explicit provision.

> Any other reading of § 503(b) would be the antithesis of the strict and narrow construction that has always been placed on priority treatment of claims in bankruptcy.

> Finally, consider the implications of claimants' argument. If claimants are entitled to priority for interest, penalties, and fees on their agreements, we must expect that every other administrative claimant—all merchants dealing with trustees or debtors, as well as attorneys and all other professionals employed in the administration of bankruptcies—will promptly incorporate similar provisions in their contracts.

> The result would grossly exacerbate "crying evils" that have long plagued bankruptcy (footnote omitted).

In fact, we would observe that Sarp's very demand for such costs reflects a general misimpression about the nature of administration claims which appears to pervade all of his submissions.

Finally, we observe that Sarp's Proof of Claim No. 29, asserting an unsecured claim for the First Colonial Action expenditures, has crept onto the claims docket. For all of the reasons set forth herein, this claim cannot be sustained and must be stricken. However, unless there is a bar date, Sarp or any other party (such as Micheel) can simply keep filing claims, and the claims can be removed only upon the filing of additional objections to them.

Our review of the main case docket in the Debtor's case indicates that no bar date for the filing of claims has ever been established in this case. See Bankruptcy Rule 3003(c)(3). We note that a good portion (nine out of 30) of the claims on the docket in this nearly seven-year-old case were filed in the last nine, post-confirmation months.[5] The continued absence of a bar date could

---

**5.** In fact, only eight of the 30 claims were filed as of the date that Sarp filed his first Proof of

Claim on March 30, 1987.

have and apparently has had a deleterious effect on our efforts to administer this case.

We are reluctant to set a bar date *sua sponte.* We will therefore direct the Plan proponents to file an appropriate Application to set such a date, or provide an explanation to the court for not doing so, within about ten days, as part of our Order.

An appropriate Order will be entered.