**In re LEASE–A–FLEET, INC., Debtor.**

**Bankruptcy No. 91–12996S.**

United States Bankruptcy Court,
E.D. Pennsylvania.

May 7, 1992.

Robert F. Kelly, U.S. Dist. Court, E.D.Pa., Patrick Stapleton, Rawle & Henderson, Michael R. Needle, Philadelphia, Pa., Sp. Counsel, for debtor.

Karen Lee Turner, Dilworth, Paxson, Kalish & Kauffman, Philadelphia, Pa., for Lauderhill.

Robert C. Sayre, Patterson & Weir, Philadelphia, Pa., for Banks.

Frederic Baker, Asst. U.S. Trustee, Philadelphia, Pa.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

The instant contested matters arise from two Applications of MORSE OPERATIONS, INC., d/b/a LAUDERHILL LEASING ("Lauderhill"), requesting allowance of administrative expenses, pursuant to 11 U.S.C. § 503(b)(1)(A), for (1) rental payments resulting from the post-petition use of its motor vehicles by the Debtor, LEASE–A–FLEET, INC. ("the Debtor"); and (2) the payoff value of motor vehicles which Lauderhill contends are "missing" and which it infers that the Debtor has retained and failed to return. The Applications present to the Court, first, the issue of whether the Debtor's use of Lauderhill's property constitutes an administrative expense entitled to priority. Second, if Lauderhill is entitled to such a priority, the court must determine the amount of same.

We hold that Lauderhill is not entitled to an allowance for the payoff of the "missing" vehicles. Lauderhill has failed to prove that the Debtor received any benefit or even has possession or control over the "missing" vehicles.

However, we also hold that Lauderhill is entitled to an administrative claim in consideration for Debtor's post-petition use of Lauderhill's vehicles. However, this Court cannot accurately quantify this claim at this time, and it does not appear that it will be able to do so until the completion of certain litigation between Lauderhill and the Debtor which is presently pending in the district court. Accordingly, we are compelled to schedule a further hearing to totally resolve this matter, and at this point simply schedule a status hearing relative to same.

### B. FACTUAL AND PROCEDURAL HISTORY

A significant portion of the history of this case can be gleaned from review of a previous Opinion arising out of this case, published at 131 B.R. 945 (Bankr.E.D.Pa. 1991) ("*LAF I*"), *rev'd in part & aff'd in part*, 141 B.R. 63 (E.D.Pa.1992) ("*LAF II*").

On May 30, 1991, the Debtor filed the voluntary Chapter 11 bankruptcy underlying the instant matters. At the time of the filing, the Debtor operated as an intermediate lessor-lessee of motor vehicles between vendor-manufacturers of motor vehicles and small automobile rental companies that leased to the public. The Debtor leased fleets of vehicles to such rental companies. *See LAF I*, 131 B.R. at 947.

The Debtor, for some years preceding its bankruptcy filing, began to acquire its vehicles from a competitor, Lauderhill, rather than directly from the manufacturers. *Id.* The vehicles were leased to the Debtor by Lauderhill pursuant to annual Motor Vehicle Lease Agreements. The leases provided that Lauderhill would furnish Debtor with certain designated vehicles. In turn, the Debtor would pay to Lauderhill a monthly rental fee. The monthly rental payments were billed in advance and due by the first day of the relevant month. However, under the terms of a "Temporary Cash Assistance Program" of Lauderhill, under which the Debtor began operating in 1990, the Debtor was allowed to pay 75% of the monthly invoices by the 20th day of the relevant month and the remaining 25% of the invoice by the 27th day of the relevant month.

In early 1991, as a result of a general economic recession and a particular decline in travel to Florida due to the Persian Gulf War, the automobile rental business in Florida, where the majority, if not all, of Debtor's customers were located, became severally depressed, and several of the Debtor's largest customers became bankrupt or defaulted on their lease payments. As a result, the Debtor was unable to make timely payments to Lauderhill for lease of its vehicles. Various attempts, including the assignment of certain third-party payments and manufacturer credits to Debtor's account, were made by Lauderhill and the Debtor to reduce the outstanding rental payment balance. Nevertheless, the Debtor's financial woes continued. Checks issued by it for monthly payments to Lauderhill on February 26, 1991, and March 26, 1991, were dishonored. The Debtor subsequently wired funds to Lauderhill to cover each of the dishonored checks. However, on May 7, 1991, Lauderhill advised the Debtor that it was terminating its leases with the Debtor and demanded the return of all of its leased vehicles. On May 28 and 30, 1991, Lauderhill drew against a $1 million irrevocable letter of credit which had been issued by Meridian Bank to Lauderhill on behalf of the Debtor, apparently causing the Debtor to file the instant bankruptcy.

Immediately thereafter, Lauderhill filed a motion in this court seeking (1) relief from the automatic stay; (2) adequate protection for Debtor's post-petition use of its vehicles; and (3) the appointment of an examiner. *See LAF I,* 131 B.R. at 947. On June 6, 1991, the date of the expedited hearing on Lauderhill's motion, the parties entered into an interim settlement which provided that the Debtor would make certain payments to Lauderhill for post-petition use of its vehicles and Lauderhill would refrain from engaging in business dealings with certain of the Debtor's customers. This latter condition was deemed necessary by the Debtor to prevent Lauderhill from preying upon its customer body, eliminating its role as a "middleman," and leaving it without any viable business.

Thereafter, the truce proved uneasy, because the agreement reached on June 6, 1991, was not reduced to writing. *See id.* A written resolution, in the form of a proposed consent order between the Debtor, Lauderhill, and two banks which had provided certain "standby" credit on a secured basis, United Valley Bank and, per its letter of credit, Meridian Bank ("the Banks"), was approved by this Court, with certain alterations which eliminated its consensual form, on July 15, 1991. The Order provided, *inter alia,* that (1) Lauderhill would have the right to directly pursue possession of leased automobiles from certain of the Debtor's sub-lessees; (2) the Debtor would pay to Lauderhill a portion of the amounts received as payments in the post-petition rental period up to an amount representing depreciation and interest (determined to be 75.8% of the amount charged by the Debtor to its customers) on the subleased vehicles; and (3) the Debtor would have the right to continue sub-leasing vehicles to certain of its customers subject to its making the aforesaid rental payments to Lauderhill and its customers' obtaining and verifying insurance of the leased vehicles in accordance with Florida law.

Almost immediately after the July 15, 1991, Order was entered, the Debtor defaulted on its terms, particularly those requiring the verification of its customers' insurance. Since the Order contained no provisions for remedies in the event of Debtor's default, Lauderhill moved to enforce the Order and requested relief from the automatic stay to repossess the leased vehicles pursuant to applicable state law. The Court scheduled a hearing on Lauderhill's motion for August 15, 1991. The Debtor failed to appear. Accordingly, Lauderhill was granted relief from the stay and became entitled to obtain possession of all of the vehicles which it had leased to the Debtor. The Order granting Lauderhill relief also provided for a hearing on September 4, 1991, for the purpose of resolving certain disputes among the Debtor, Lauderhill, and the Banks regarding their rights under the Order of July 15, 1991.

On September 4, 1991, a hearing was conducted on two issues: (1) whether Laud-

erhill was entitled to recover 75.8% of the Debtor's post-petition receipts as to two of the Debtors' customers, Miami Rent–A–Car, Inc. ("Miami") and Glenn Auto Rentals, Inc. ("Glenn"), or was confined to state-law remedies in light of its having obtained relief from the stay; and (2) whether rental payments received by the Debtor from two other customers, Lindo's Rent–A–Car, Inc. ("Lindo") and USA Rent–A–Car/Florida, Inc. ("USA"), were pre-petition payments, in which case the Banks were entitled to recover them under the July 15, 1991, Order, or were post-petition payments, of which Lauderhill was entitled to 75.8% pursuant to that Order.

In an Order of September 5, 1991, we decided that Lauderhill was not entitled to 75.8% of the Debtor's receipts from Miami and Glenn. On September 26, 1991, we issued *LAF I.* There, we concluded that the payments received by Debtor from Lindo and USA were for post-petition leasing charges. *See* 131 B.R. at 949–52. Both Lauderhill and the Banks filed motions requesting the Court to reconsider certain aspects of the September 5, 1991, and September 26, 1991, Orders. After a hearing on November 6, 1991, we denied all of these motions in an Order of November 7, 1991. Lauderhill and the Banks appealed *LAF I.*

In *LAF II,* the district court entered an Order affirming our decision that the Lindo and USA payments were post-petition payments, of which Lauderhill was entitled to 75.8%, and reversing our finding that Lauderhill was not entitled to 75.8% of the Miami and Glenn payments. *LAF II,* which was decided after the trial of the instant contested matters, therefore had the effect of expanding and solidifying Lauderhill's rights to recover post-petition payments from the Debtor, and of diminishing somewhat the significance of the instant matters.

On February 4, 1992, Lauderhill filed the two Applications before us requesting allowances for administrative expense for (1) rental payments for Debtor's post-petition use of Lauderhill's vehicles; and (2) the payoff value of vehicles which Lauderhill claimed to have rented to the Debtor, but which it could not locate and hence deemed "missing."

The Court conducted a hearing on the Applications on March 11, 1992. Testimony relevant thereto was adduced from Karen Lee Turner, Esquire, Lauderhill's counsel in the instant bankruptcy proceedings ("Turner"); William Bruce Pitcher, an insurance broker who performed services for Lauderhill ("Pitcher"); and James Logue, Lauderhill's General Manager ("Logue"). The Debtor called its general counsel, David Mallenbaum, Esquire ("Mallenbaum"). The testimony presented by Lauderhill was offered in support of its contention that the Debtor's use of Lauderhill's vehicles provided a benefit to the Debtor's estate and, as such, entitled it to administrative claims. Lauderhill further urged that the value of the expense of the leased vehicles be measured by the monthly rental rates as provided by the current lease between the parties.

After the hearing, the Court entered an Order providing that all parties simultaneously file Opening Briefs on or before March 23, 1992, and Reply Briefs on or before March 30, 1992, later extended to April 1, 1992, supporting their respective positions on Lauderhill's Applications. All parties, Lauderhill in support of the Applications and the Debtor and the Banks in opposition thereto, filed and served both an Opening Brief and a Reply Brief.

On December 11, 1991, the Debtor filed its initial liquidating plan of reorganization. After several redrafts of the plan itself and its accompanying disclosure statement, this plan finally came before us for a confirmation hearing on April 22, 1992. However, the confirmation process was continued at that time until May 20, 1992, to allow the Banks to file a motion requesting permission to change their votes rejecting this Plan to votes accepting the Plan.

On February 25, 1992, Lauderhill filed a competing plan of reorganization. After an amended disclosure statement was approved, a confirmation hearing on this plan was initially scheduled on May 27, 1992. However, this confirmation hearing was moved up to May 20, 1992, the date of

confirmation of the Debtor's plan, on April 22, 1992.

Also before the court, and highly relevant to the reorganization process, is a motion of Lauderhill to allow it to vote its disputed pre-petition unsecured claim in excess of $3 million. The Debtor is attacking this motion, principally on the basis of 11 U.S.C. § 502(d) and a contention that Lauderhill is liable to the Debtor over $5 million in pre-petition preferential payments. The trial of a preference action instituted by the Debtor against Lauderhill in connection therewith, Adversary No. 92–0172S ("the Preference Action"), was begun before this court in an all-day session of April 27, 1992, and completed after another all-day session of May 4, 1992. Briefing is to be completed by May 15, 1992. Resolution of the Preference Action may be a necessary first step in the confirmation process.

## C. DISCUSSION/CONCLUSIONS OF LAW

### 1. LAUDERHILL IS MOST LIKELY ENTITLED TO AN ALLOWANCE FOR AN ADMINISTRATIVE EXPENSE ON ACCOUNT OF THE DEBTOR'S ACTUAL POST–PETITION USE OF LAUDERHILL'S PROPERTY.

a. *The Debtor's use of Lauderhill's vehicles was an actual and necessary expense in furtherance of the Debtor's post-petition operations.*

The Bankruptcy Code contains provisions which are designed to promote the viability and enable the continuance of insolvent businesses. *See In re Zagata Fabricators, Inc. v. Superior Air Products,* 893 F.2d 624, 627 (3rd Cir.1990); and *In re United Trucking Service, Inc.,* 851 F.2d 159, 161–62 (6th Cir.1988). One key provision to this end is set forth in 11 U.S.C. § 503(b)(1)(A) as follows:

> (b) After notice and hearing, there shall be allowed administrative expenses other than claims allowed under section 502(f) of this title, including—
>
> (1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commis-

sions for services rendered after the commencement of the case; ...

In *Zagata,* the court found that "[b]y placing creditors who are entitled to payment of these administrative expenses first in line, sections 503 and 507 advance the estate's interest in survival above all other financial goals." 893 F.2d at 627.

■ Since the affording of priority status to one creditor has an impact upon other creditors of the debtor's estate and conflicts with the goal of bankruptcy to provide creditors with an equal distribution of a debtor's resources, this court has consistently held that administrative claims must be narrowly construed. *See In re Philadelphia Mortgage Trust,* 117 B.R. 820, 825–28 (Bankr.E.D.Pa.1990); *In re Leedy Mortgage Co.,* 111 B.R. 488, 491 (Bankr.E.D.Pa.1990); and *In re Grant Broadcasting of Philadelphia, Inc.,* 71 B.R. 891, 897 (Bankr.E.D.Pa.1987). In *Grant Broadcasting,* this Court reasoned as follows:

> [w]e do not consider it to have been the intent of Congress, in enacting Section 503(b)(1)(A), to saddle debtors with special post-petition obligations lightly or give preferential treatment to certain select creditors by creating a broad category of administrative expenses. Hence we would read Section 503(b)(1)(A) narrowly....

*Id.*

■ Since allowances for administrative claims must be narrowly construed, courts have established demanding criteria for determining whether a claim should be afforded an administrative priority. *In re Mammoth Mart, Inc.,* 536 F.2d 950, 953–54 (1st Cir.1976), "is generally cited as establishing the appropriate test for determining entitlement to administrative expense priority." *Philadelphia Mortgage Trust, supra,* 117 B.R. at 827. This test

> set[s] forth two conditions to be met before a claim is entitled to priority treatment under Section 503(b)(1)(A):
>
> "For a claim in its entirety to be entitled to first priority under section 64(a)(1) [Section 503(B)(1)(A)'s prede-

cessor in the Bankruptcy Act], the debt must arise from a transaction with the debtor-in-possession. When a claim is based upon a contract between the debtor and the claimant, the case law teaches that a creditor's right to payment will be afforded first priority only to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of the business."

*Id.*, quoting *Mammoth Mart, supra,* 536 F.2d at 954. Therefore, an administrative claim will be allowed when the expense (1) arises post-petition; and (2) is beneficial to the Debtor's estate. Lauderhill's request for an administrative claim in consideration for the Debtor's use of its motor vehicles must therefore satisfy these two requirements.

█ The Banks, in particular, argued that, since the lease was a pre-petition contract, Lauderhill's claims must be considered pre-petition and hence non-administrative claims. However, as we explained in *In re Farley,* 135 B.R. 493, 495 (Bankr. E.D.Pa.1992), "whether a debt is pre-petition or post-petition is controlled by when the creditor's 'right to payment' arises," citing *In re M. Frenville Co.,* 744 F.2d 332, 337 (3d Cir.1984), *cert. denied sub nom. M. Frenville Co. v. Avellino & Bienes,* 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985); and *In re McNeil,* 128 B.R. 603, 610 (Bankr.E.D.Pa.1991). Lauderhill's right to payment for post-petition vehicle rentals arose post-petition, even though its contract with the Debtor was entered into pre-petition. *Compare Farley, supra,* 135 B.R. at 495–96. Therefore, this aspect of the requirements for an administrative claim is clearly met.

█ The second prong of the *Mammoth Mart* test requires that the Debtor's estate receive a benefit from the expenses incurred as alleged administrative claims. In determining whether an expense is "beneficial" to a debtor's estate, the courts have focused on the "necessity" of the expense to the estate. *See Zagata, supra,* 893 F.2d at 627; *In re F.A. Potts & Co.,* 137 B.R. 13,

16 (E.D.Pa.1992); *Leedy Mortgage, supra,* 111 B.R. at 491; and *Grant Broadcasting, supra,* 71 B.R. at 897. *See also, e.g., In re Patch Graphics,* 58 B.R. 743, 746 (Bankr. W.D.Wis.1986) (allowance of an administrative claim requires a "showing that the equipment was necessary to preserve the estate").

Again, the record made by the parties and evidence presented at trial in this matter establishes that, at least in a general sense, the Debtor's use of Lauderhill's vehicles was both beneficial and absolutely necessary to its business. As discussed above, both prior to and subsequent to the filing of the instant bankruptcy case, the Debtor's sole business consisted of subleasing motor vehicles, all of which were obtained from Lauderhill, to small rental companies. The Debtor did not own any vehicles, nor did it lease any vehicles from any other sources. Clearly, without the use of Lauderhill's vehicles, the debtor would have no access to assets which were essential to the continued viability of its business. This fact is further underscored by noting that, once the stay was lifted and the Debtor returned the vehicles to Lauderhill, the Debtor ceased to be a viable business enterprise.

In *Zagata, supra,* the Court reviewed a lower court's ruling which denied a landlord's request for an administrative expense for post-petition rent. The Court held that

[i]n order to survive, a financial entity almost always needs a physical space to occupy. When a debtor owns no suitable real estate of its own, its only choice is to become a tenant, and to assume the obligation of paying periodic rent to a landlord. In such circumstances, therefore, rent is clearly and "actual, necessary" cost of preserving the estate, since *the debtor's survival depends on its ability to pay the landlord for the right to possess the space necessary to conduct its business* (emphasis added).

893 F.2d at 627.

The court's ruling in *Zagata,* although addressing the issue of payments for the debtor's real-estate rental, is equally appli-

cable to the situation in issue here. It is clear that the Debtor had no vehicles of its own to sub-lease to its customers. The Debtor's only choices were to lease motor vehicles and assume the obligation of paying periodic rent to Lauderhill for same or to cease doing business. Accordingly, the expense of leasing Lauderhill's vehicles should generally be classified as an expense which Lauderhill is entitled to request as an administrative claim.

b. *Although Lauderhill established that it is entitled to an administrative expense for its post-petition vehicle rentals to the Debtor, it was unable to prove the precise amount of its claim.*

■ An applicant for an award of administrative expenses has the burden of proving that an entitlement to the claim sought by establishing that the Debtor's estate benefitted from the applicant's services to the extent of the claim allowed. *See In re Amarex, Inc.,* 853 F.2d 1526, 1530 (10th Cir.1988); *In re FRG, Inc.,* 124 B.R. 653, 658 (Bankr.E.D.Pa.1991). *See also In re Woodstock Associates I, Inc.,* 120 B.R. 436, 451 (Bankr.N.D.Ill.1990) (burden of proving entitlement to administrative expenses is on claimant, and standard of proof is preponderance of the evidence); *Philadelphia Mortgage Trust, supra,* 117 B.R. at 827 ("the burden of proving entitlement to a priority is on the person claiming priority"); and *In re United States Lines, Inc.,* 103 B.R. 427, 429 (Bankr.S.D.N.Y.1989) (burden of proof as to substantial benefit rendered to estate is on applicant for administrative-expense claim, and entitlement to award must be established by preponderance of evidence). The administrative claimant must therefore prove both (1) that the expense was "actual" and "necessary;" and (2) the reasonable value of the expense. *See also, Zagata, supra,* 893 F.2d at 627.

We conclude that, largely because of circumstances beyond its control, Lauderhill was unable to prove the "reasonable value" of its administrative claim at the hearing on the Applications. The standard for determining the "reasonable value" of an administrative expense was set forth by this court in *Grant Broadcasting, supra,* 71 B.R. at 896–900. There, the suppliers of programming to a Chapter 11 debtor television station requested that they be granted an administrative claim for the entire amounts due under certain licensing contracts between them and the debtor. *Id.* at 893. The debtor opposed this request and argued that the suppliers were entitled to payment for only the programming that the debtor had actually used on the air. *Id.* at 894.

■ This court, in addressing the programmers' motion, discussed at length the two lines of cases which have developed with respect to the issue of determining the reasonable value of an administrative expense. *Id.* at 896–99. The first line, sometimes referred to as the "objective approach," holds that the value is determined by the reasonable rental value of the property provided without regard to its actual use by the Debtor. *Id.* at 896, quoting 3 COLLIER ON BANKRUPTCY, ¶ 503.-04[1][a][ii], at 503–24 n. 14 (15th ed. 1986). The second line, sometimes called the "subjective approach," holds that reasonable rental value is based on the property actually used by the debtor. *Id.* at 896–97.

In *Grant Broadcasting,* 71 B.R. at 897, we rejected the first line of cases, set forth most notably in *In re Fred Sanders Co.,* 22 B.R. 902 (Bankr.E.D.Mich.1982), stating that

[w]e believe there is a basic policy reason why the reasoning of *Fred Sanders* is unacceptable. We do not consider it to have been the intent of Congress, in enacting § 503(b)(1)(A), to saddle debtors with special post-petition obligations lightly or give preferential treatment to certain select creditors by creating a broad category of administrative expenses. Hence, we would read § 503(b)(1)(A) narrowly, and so reading it cannot conclude that costs for unused property is *necessary* to preservation of a debtor's estate.

We adhere to that position today. We acknowledge that *F.A. Potts, supra,* 137 B.R. at 17, in considering a real-estate lease, which we indicated in *Grant Broadcasting*

was a species of executory contract traditionally entitled to special treatment, 71 B.R. at 898–99, appears to follow *Fred Sanders*, which was also a real-estate lease case. However, we find that *Zagata* makes no such commitment. We continue to believe that the holding of *Grant Broadcasting* is the more consistent with the general bankruptcy policy requiring a narrow scope of allowance of administrative claims.

Lauderhill argues that the "reasonable" value of the Debtor's use of its property, under the standard set forth in *Fred Sanders* is measured strictly by the terms of the parties' lease. Since we decline to adopt the "reasonable" value standard of *Fred Sanders*, we cannot agree. The scope of claims under § 503(b)(1)(A) is limited to only those expenses that are both "actual" and "necessary" costs of preserving the estate. A necessary expense has been defined as one which provides a definitive measure of benefit to the debtor's estate. *Zagata, supra*, 893 F.2d at 627 (landlord's right to collect monetary relief is somewhat curtailed, and debtor is generally required to pay only reasonable value for *use and occupancy* of landlord's property); and *FRG, supra*, 124 B.R. at 658 (administrative expense must benefit the estate or all parties and have a direct, significant and demonstrable effect upon the estate). Again, the bankruptcy policy of providing all creditors with an equal distribution of the debtor's estate requires that a priority claim such as § 503(b)(1)(A) be strictly construed. *See Philadelphia Mortgage Trust, supra*, 117 B.R. at 826 (quoting *Patch Graphics, supra*, 58 B.R. at 745).

Alternatively, Lauderhill argues that, even if the *Grant Broadcasting* approach is applied, it is entitled to the full amount of the rents chargeable to the Debtor because the Debtor "actually used" all of the vehicles leased by Lauderhill to it. The Banks, particularly, challenge this assertion, arguing that Lauderhill presented no evidence of the actual amounts received by the Debtor from subleasing of the vehicles to its customers.

We disagree with the Banks' contention that Lauderhill's inability to prove the precise amount of its claim would justify dismissal of the First Application. The testimony of Mallenbaum provided some range of quantification of Lauderhill's claim. He stated that the Debtor collected about $800,000 from its customers on account of post-petition sub-leases, and billed approximately $1.2 million from those customers. It is established, by the July 15, 1991, Order, that Lauderhill is entitled to at least 75.8% of the amounts collected by the Debtor from its customers. It therefore seems clear that Lauderhill has proven that at least 75.8% of $800,000, or about $600,-000, of the income received by the Debtor from sub-leases of vehicles leased from Lauderhill represents its share of receipts from vehicles "actually used" by the Debtor. Therefore, Lauderhill appears to be entitled to an administrative claim of at least that amount.

However, it is also clear that some adjustments to this figure are in order. Lauderhill's success in *LAF II* appears to provide it with a clear right to retain 75.8% of the $553,262.80, or about $420,000, paid to the Debtor by Lindo and USA, and a right to 75.8% of the sums paid to the Debtor by Miami and Glenn post-petition, the amounts of which are not quantified on this record. These recoveries in *LAF II* must be deducted from Lauderhill's instant administrative claim to preclude a double recovery.

The Debtor argues that Lauderhill should not receive any administrative claim because its pre-petition and post-petition actions were calculated to, and ultimately did, ruin the Debtor and drive it out of business. These are, essentially, the claims made by the Debtor against Lauderhill in two of the three actions (the other is a countersuit by Lauderhill) scheduled for a consolidated jury trial before the district court, beginning May 11, 1992.

Lauderhill responds by contending that the Debtor is not entitled to set off its claims in those actions against its administrative claims in this case. However, if the district court suits result in a decision that

all of Lauderhill's actions were indeed calculated to ruin rather than benefit the Debtor, it would seem anomalous to award Lauderhill a sizable administrative claim. Whatever claims Lauderhill would have would then seem to be subject to subordination, not prioritized treatment. It is particularly difficult to see how Lauderhill could be entitled to an administrative claim for rentals of cars which were subleased by customers of the Debtor but were unpaid if the district court cases result in a finding that Lauderhill induced the Debtor's customers not to pay it.

We therefore conclude that, unless the Debtor achieves great success in the district court lawsuits, Lauderhill is entitled to some administrative claim on account of the vehicles rented by it to the Debtor post-petition. The figure should be measured by no more than the profit margin to which Lauderhill was entitled, under its lease contract, as to only those vehicles actually subleased or otherwise used by the Debtor in its business. Deducted from that figures should be sums which Lauderhill receives as a result of the decision in *LAF II*, and possibly other sums which the district court litigation determines that the Debtor is entitled to recover from Lauderhill.

■ In the course of the trial of the Preference Action, we discussed these tentative conclusions with the parties. Lauderhill argued that we should conditionally allow its administrative claim "in full," subject to possible offsets from the result in *LAF II* and the district court litigation. The Banks and the Debtor argued that the presence of the foregoing contingencies rendered any administrative claim so uncertain as to require denial of the First Application because of Lauderhill's failure to meet its burden of proof.

We do not agree with either position. The decisions in *LAF II* and the district court litigation subsequent to the hearing of March 11, 1992, were factors affecting its administrative claim which were beyond Lauderhill's control. Lauderhill has, barring a disastrous result in the district court, which was not established on this record as necessarily likely to occur, prov-

en a clear right to certain administrative claims for vehicles leased to the Debtor post-petition. If necessary, we have enough data on the record to establish Lauderhill's administrative claim for some amount with the requisite "reasonable certainty." *See In re Chapman*, 77 B.R. 1, 6 (Bankr.E.D.Pa.1987).

On the other hand, we see no reason for estimating a claim unless there is a reason to do so, for purposes of voting on a plan of reorganization or otherwise. We note that, although Lauderhill has asked us to temporarily allow or estimate its pre-petition claim for purposes of voting on the Debtor's plan of reorganization, it has not requested us to temporarily allow its administrative claim for any reason.

In our accompanying Order, we therefore schedule a status hearing relating to the First Application on the date of the confirmation hearings on both plans of reorganization before us, at which we hope to develop a process for supplementation of the record in order to allow final determination of Lauderhill's administrative claim on account of the Debtor's actual post-petition use of its vehicles after the projected date of the verdict in the district court litigation.

2.  LAUDERHILL IS NOT ENTITLED TO AN ADMINISTRATIVE· ALLOWANCE FOR THE PAYOFF VALUE OF "MISSING" VEHICLES,` SINCE IT WAS UNABLE TO PROVE THAT THESE VEHICLES PROVIDED ANY BENEFIT TO THE DEBTOR'S ESTATE.

■ Lauderhill's Second Application for Allowance of Administrative Expense seeks a payment for the "payoff" values of "missing" vehicles. To be allowable, this request must of course also meet the requirements of § 503(b)(1)(A) as discussed above, *i.e.*, the expense must have (1) arisen post-petition; and (2) benefitted the Debtor's estate. *See* page 844 *supra.* We conclude that this request of Lauderhill must be denied for several reasons.

Firstly, Lauderhill failed to prove that the Debtor incurred a liability or an expense to it for the "missing" vehicles. The testimony of Logue revealed that initially Lauderhill was uncertain of the whereabouts of *65* vehicles. It subsequently located 52 vehicles. None of these vehicles were "found" in the possession of the Debtor. Rather, the vehicles were, in all instances which Logue could specifically recall, located with the Debtor's sub-lessees and determined not to have been leased to the Debtor at all. However, since it was still unable to ascertain the fate of the 13 remaining vehicles, Lauderhill assumed that the Debtor retained and was responsible for "losing" these vehicles post-petition.

Mere assumption, with no apparent historical basis, is an insufficient means by which to establish that there was an "actual" benefit obtained therefrom by the Debtor. *See Patch Graphics, supra,* 58 B.R. at 745. Lauderhill was required to offer more than mere speculation that this element was satisfied. *See Woodstock Associates, supra,* 120 B.R. at 451; *In re D'Lites of America, Inc.,* 108 B.R. 352, 355–56 (Bankr.N.D.Ga.1989); and *United States Lines, supra,* 103 B.R. at 429. Evidence that the Debtor possessed or maintained the vehicles in question subsequent to the initiation of the bankruptcy case might have established an "actual" expense. However, Lauderhill offered no such proof. Rather, the testimony of Logue suggested that the "missing" vehicles could have been lost or destroyed by it or sublessees, as well as by the Debtor, or they could have been in the possession of any one of several entities both prior to and subsequent to . the bankruptcy filing.

Secondly, Lauderhill did not prove that the Debtor's estate accrued any "benefit" from the "missing" vehicles. As discussed at page 844 *supra,* administrative claims are allowed when such expense items are "necessary" to preserve the estate. *Zagata, supra,* 893 F.2d at 627; *F.A. Potts, supra,* 137 B.R. at 16; and *Grant Broadcasting, supra,* 71 B.R. at 897. Lauderhill presented no evidence that the "missing" cars were necessary for the continued viability of the Debtor's estate. Although Lauderhill proved that the Debtor generally derived a benefit from subleasing Lauderhill's vehicles to its customers, it failed to do so in connection with the specific "missing" vehicles. There was no showing that the "missing" vehicles were either (1) maintained or possessed by the Debtor either before or after the filing of the underlying bankruptcy; (2) sub-leased by the Debtor to its sub-lessees; or (3) resulted in the Debtor's receiving any payment from its sub-lessees for use of the "missing" vehicles.

In *United Trucking Service, supra,* the Court addressed the issue of whether an administrative expense should be allowed for the cost of leased items which are lost, stolen, missing or otherwise not returned to the creditor and for which there is no proof that the Debtor possessed post-petition. There, the debtor had entered into an eight year equipment lease with Great Dane Trailers, Inc. ("Great Dane") for the rental of trailers. 851 F.2d at 160. The lease provided that the debtor would maintain the trailers in "good" condition and make any necessary repairs at its own expense. *Id.* Prior to the expiration of the lease, the debtor filed a voluntary bankruptcy case. *Id.* Immediately thereafter, Trailer Rental Co. ("TRC"), Great Dane's successor in interest, filed a petition to compel debtor to assume or reject the lease. *Id.* The debtor did not respond and the bankruptcy court deemed the lease "rejected." *Id.* Subsequently, United returned all of the trailers, with the exception of two which had been deemed stolen, to TRC. *Id.* at 161. TRC then filed an application with the bankruptcy court seeking an allowance for administrative expense for the costs of repairs it made to the returned vehicles and the casualty loss of the two "stolen" trailers. *Id.* Following a hearing on the matter, the bankruptcy court issued an order allowing the request for administrative expense for the costs of repairs and the casualty loss. *Id.* On appeal, the district court affirmed the bankruptcy court's decision. *Id.*

The Court of Appeals, overruling the two lower court decisions in part, held that

[t]he bankruptcy court erred in allowing claims arising from the stolen trucks as an administrative expense. As indicated in our prior discussion, § 503 priority should be granted only to reflect actual value conferred on the bankrupt estate ... (citations omitted). Because the two trailers were never in [the debtor's] possession after the date of bankruptcy, according to the stipulation, they could not have been of any benefit to the bankrupt estate. Similarly, [the debtor's] obligation to pay TRC the casualty loss value of the stolen trailers must be regarded as arising pre-petition. Whether [the debtor] continued to pay rent on the stolen vehicles after the bankruptcy filing is irrelevant. Because the estate never possessed or received any benefit from the two trailers, any claims of TRC against [the debtor] with regard to those trailers must have arisen *pre-petition* and are properly treated as general unsecured claims rather than administrative expenses.

*Id.* at 163.

The ruling in *United Trucking Service*, although it involved leased trailers which were admittedly stolen, is applicable to Lauderhill's Second Application. The evidence presented at the instant hearing did not prove that Debtor ever possessed the "missing" vehicles post-petition. In that respect, the instant facts are clearly more adverse to the administrative claimant than those in *United Trucking Service*. Moreover, there was absolutely no evidence that the Debtor's estate received any benefit from the "missing" vehicles in question at any time. Accordingly, Lauderhill's Second Application for an allowance of administrative expenses must be denied.

## D.  CONCLUSION

For all of the reasons stated herein, we conclude that Lauderhill is probably entitled to some administrative claim, but only on its First Application. Since the Court is unable to determine the amount of that claim, further proceedings (or agreements of the parties) to determine the amount of the allowed administrative expenses will be necessary. We will list this matter for a status conference on May 20, 1992, presently scheduled as the date for confirmation hearings on both the Debtor's plan and Lauderhill's competing plan.

### ORDER

AND NOW, this 7th day of May, 1992, after a hearing of March 11, 1992, to determine whether Lauderhill's First and Second Applications for Allowance of Administrative Expenses should be allowed, and upon consideration of the interested parties' post-hearing submissions, it is hereby ORDERED AND DECREED as follows:

1.  Lauderhill's Second Application for Administrative Expense is DENIED.

2.  A status hearing to set a hearing date on which the parties will be accorded an opportunity to present additional evidence relative to Lauderhill's First Application for Administrative Expense is scheduled on

WEDNESDAY, MAY 20, 1992, at 9:30 A.M. and shall be held in Courtroom No. 2 (Room 3718), United States Court House, 601 Market Street, Philadelphia, PA 19106.