In re the **GRAND UNION COMPANY,** et al., Debtors.

Nos. 00–39613 through 00–39616(NLW).

United States Bankruptcy Court, D. New Jersey.

Aug. 30, 2001.

Jonathan I. Rabinowitz, Henry Karwowski, Rabinowitz, Trenk, Lubetkin & Tully, PC, West Orange, NJ, for Plaintiff CS Integrated, LLC.

Howard S. Greenberg, Morris S. Bauer, Ravin Greenberg, PC, Roseland, NJ, Co-counsel for Defendant The Grand Union Company.

## OPINION

NOVALYN L. WINFIELD, Bankruptcy Judge.

### INTRODUCTION

This matter comes before the Court on a motion filed by CS Integrated, LLC ("CSI") to obtain an administrative expense priority and payment for certain of its claims against the Debtor. The Debtor opposes this relief on the ground that all of the CSI claims constitute rejection damages pursuant to 11 U.S.C. § 502(g) and thus are not entitled to priority under 11 U.S.C. § 503(b).

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Standing Order of Reference issued by the United States District Court for the District of New Jersey on July 23, 1984. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) & (B). The following constitutes this Court's findings of fact and conclusions of law made in accordance with Bankruptcy Rule 7052.

### FACTS

On October 3, 2000 ("Petition Date") The Grand Union Company, Grand Union Stores, Inc. of Vermont, Grand Union Stores of New Hampshire, Inc. and Specialty Merchandising Services, Inc. (the "Debtors" or "Grand Union") filed petitions for relief under Chapter 11 of Title 11, United States Code ("Bankruptcy

Code") and were continued in possession of their assets and management of their affairs. As of the Petition Date, CSI was providing warehousing, ice manufacturing, supply and transportation services to Grand Union. CSI continued to provide these services post-petition until January 13, 2001, when the contract between the parties was rejected.

The contractual relationship between the parties began on June 13, 1989. On that date, Grand Union & CSI entered into an agreement which was periodically amended and modified over a period of about ten years ("the Agreement"). Among the initial services provided by CSI was the warehousing and distribution of frozen foods. In connection with the provisions of these services CSI built a warehouse in accordance with specifications set forth in the Agreement. For its warehousing services, CSI charged the Debtors an agreed upon rate per case of frozen food & ice cream ("Case Rate"). This rate was periodically modified by amendment to the Agreement. Grand Union was required to pay the effective Case Rate for a minimum annual volume of cases of inventory received at the warehouse regardless of the actual number of cases received by CSI ("Minimum Volume Threshold"). CSI asserts that both the Case Rate and the Minimum Volume Threshold were set primarily to reflect CSI's costs associated with the warehouse. If, in any given year, the actual number of cases received at the warehouse was less than the Minimum Volume Threshold, the Debtors were required to pay the Case Rate for the difference ("Shortfall"). The contract year ran from April 1 through March 31. Any Shortfall owed by the Debtors for failure to achieve the Minimum Volume Threshold of cases was invoiced and paid at the end of the contract year.

Under the Agreement, CSI also provided supply and distribution services to Grand Union. Pursuant to its arrangement with CSI, Grand Union would purchase frozen foods and ice cream from third party vendors. The cases of frozen foods and ice cream were then shipped to the warehouse and CSI purchased the frozen foods and ice cream from Grand Union. On an "as needed" basis, individual Grand Union stores would then make purchases from CSI who would also deliver the frozen foods and ice cream to the individual stores. Reconciliation of the purchases and sales were performed on a regular basis and payments were transmitted by wire transfer.

The Agreement also provided:

upon termination of the Agreement (for any reason whatsoever), [Grand Union] shall pay to CSI on the date of such termination an amount equal to the consideration previously paid by CSI to [Grand Union] with respect to any remaining Inventory or other products stored by CSI at any of its facilities, in accordance with the Agreement (which amount shall not be subject to adjustment, setoff or recoupment) . . .

("Repurchase Obligation"). On March 30, 2000, Grand Union notified CSI that it was terminating all agreements with CSI, effective March 31, 2001 ("Termination Date").

Approximately two weeks after the Petition Date, on October 16, 2000, the Debtor filed a motion to sell substantially all of its assets. An auction was thereafter conducted on November 16, 2000 and C & S Wholesale Grocers, Inc. ("C & S") was the successful bidder. On November 20, 2000 the Debtor filed a supplement to its sale motion in which it disclosed C & S as the winning bidder to all holders of executory contracts and unexpired leases with Grand Union, and further advised that certain of

the executory contracts might be assumed as part of the sale. CSI was among the parties who were so notified. On November 30, 2000 and December 8, 2000, the Court conducted a hearing to consider whether the sale to C & S should be approved and to consider the assumption and assignment of certain executory contracts.

On November 21, 2000, CSI filed a limited an objection to approval of the sale and cross moved for order fixing the date by which the Debtors must assume or reject the CSI agreements. Additionally, on December 11, 2000, CSI filed a motion seeking relief from the automatic stay or to compel the Debtors to provide adequate protection. These motions were heard by this Court on December 15, 2000 and December 18, 2000. At the conclusion of the hearings, the Court gave Grand Union until January 15, 2001 to decide whether to assume or reject the CSI Agreements. The Court denied CSI's motion for relief from stay and ordered the Grand Union and CSI to reconcile their respective inventory and service accounts by the close of business on December 22, 2000. The Court also directed the parties to perform under the Agreement on a going forward basis. To meet its concern that the warehouse inventory would rise to unacceptable levels as a result of continued shipments of frozen foods and ice cream to the warehouse, CSI was granted the right to renew its request for stay relief on not less than seventy-two hours notice if the inventory levels did not decline as anticipated over the holiday season. The Court also provided in an order that it would conduct a further hearing on January 9, 2001 to consider, *inter alia*, CSI's right to recoupment and/or offset, to reconcile any outstanding disputes relating to the accounts, and to determine whether CSI was entitled to a § 507(d) super priority administrative claim.

The Court received a letter request from CSI for an expedited hearing to address the Debtor's request for additional inventory to be placed with CSI. The Court conducted a hearing on January 5, 2001, and authorized the Debtors to place additional inventory with CSI at a level of no more than $3,800,000.

On January 9, 2001, Grand Union advised the Court that it would reject the Agreement at the close of business on January 13, 2001 ("Rejection Date"). During the hearing, the Debtors represented that the only incoming inventory to the CSI warehouse would be six truckloads scheduled for delivery on January 10, 2001. Grand Union explained to the Court that these deliveries to the warehouse were essential to fulfill individual store requirements, particularly with respect to product mix, and that the inventory balance as of the Rejection Date would be approximately $3,300,000.

On January 10, 2001, the CSI warehouse received inventory totaling $183,187.60. For the next 3 days, only $33,222.90 of inventory was shipped out to individual Grand Union stores. A total of $149,814.72 of the inventory delivered on January 10th remained at the CSI warehouse after the Rejection Date. ("Excess Inventory").

CSI argues that all of its claims which arise from the Agreement are subject to administrative priority pursuant to 11 U.S.C. § 503(b). The first claim CSI asserts is for the $891,364.34 Shortfall. The second claim for which it seeks recovery is for the Debtor's Repurchase Obligation of $3,400,837.80. The third claim is for the $149.814.72 of Excess Inventory which had been delivered on January 10, 2001. CSI claims that the Shortfall and the Repurchase Obligation arose on January 13, 2001, the date the Agreement was reject-

ed. CSI argues that the rejection constituted a termination which triggered the Debtor's obligation to pay the Repurchase Obligation and the Shortfall for the contract year ending March 31, 2001. As to the Excess Inventory, CSI observes that the inventory was placed in CSI's warehouse postpetition, at the specific request of the Debtor. Grand Union objects to administrative expense priority for any of the three claims.

As set forth at greater length below, the Court grants CSI's claim for administrative priority with respect to the Excess Inventory and denies CSI's claim for administrative priority with respect to the Shortfall and the Repurchase Obligation.

## DISCUSSION

Section 503(b)(1)(A) of the Code defines an administrative expense as including, "the actual necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case . . ." Administrative expenses are categorized as a first priority claim in a bankruptcy case. 11 U.S.C. § 507(a)(1).

█ The purpose of granting administration expenses a priority for payment is to encourage creditors to cooperate with a debtor's reorganization efforts so that the debtor can effectively reorganize and continue its business, thereby maximizing the value of the estate for the benefit of all creditors. *In re Baldwin Rental Centers, Inc.*, 228 B.R. 504, 511 (Bankr.S.D.Ga. 1998) (citing *Alabama Surface Mining Comm'n v. N.P. Mining Co. (In re N.P. Mining Co.)*, 963 F.2d 1449, 1452 (11th Cir.1992)). Additionally, by granting administrative expense priority under section 503(b)(1)(A) to those expenses actual and necessary to preserve the debtor's estate unjust enrichment of the debtor's estate is prevented. *Id.*

█ However, "[b]ecause the presumption in bankruptcy is that the debtor's limited resources will be equally distributed among his creditors, statutory priorities are narrowly construed." *Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 100–101 (2d Cir. 1986) (citing *Joint Industry Board v. U.S.*, 391 U.S. 224, 228, 88 S.Ct. 1491, 20 L.Ed.2d 546 (1968); *In re United Merchants and Mfrs., Inc.*, 597 F.2d 348, 349 (2d Cir.1979); *In re Mammoth Mart, Inc.*, 536 F.2d 950, 953 (1st Cir.1976)). "If one claimant is to be preferred over others, the purpose should be clear from the statute." *Id.* (citing *Nathanson v. N.L.R.B.*, 344 U.S. 25, 29, 73 S.Ct. 80, 97 L.Ed. 23 (1952); *Matter of Jartran, Inc.*, 732 F.2d 584, 586 (7th Cir.1984)). As such, courts have established demanding criteria for determining whether a claim should be afforded an administrative priority. *In re Lease–A–Fleet, Inc.*, 140 B.R. 840, 844–845 (Bankr.E.D.Pa.1992).

█ Courts generally follow a 2–part test to determine whether a claim is entitled to first priority administrative status. This test was set forth in the seminal case of *In re Mammoth Mart, Inc.*, 536 F.2d at 954, and has been relied on by CSI in its motion. First, the claim must arise from a transaction with the debtor-in-possession. Second, when the claim is based on a contract between the debtor and the claimant, a creditor's right to payment will be afforded first priority only to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of the business. *Id.* See also, *In re Molnar Bros.*, 200 B.R. 555, 559 (Bankr.D.N.J.1996) (citations omitted).

### I. Excess Inventory

█ As set forth above, under the *Mammoth Mart* criteria, when third par-

ties are induced to supply goods or services to the debtor-in-possession pursuant to a contract that has not been rejected, their claims must be afforded priority. The CSI claim based on Excess Inventory qualifies as an administrative expense under *Mammoth Mart*. First, the transaction which resulted in the Excess Inventory occurred post-petition between CSI and Grand Union prior to rejection of the Agreement. Second, CSI's acceptance of the inventory was beneficial to the Debtor's estate since it was acquired in order to fulfill store requirements. Thus, the inventory was obtained in furtherance of the Debtor's post-petition operations.

In determining whether an expense is "beneficial" to a debtor's estate, courts have focused on the "necessity" of the expense to the estate. *Lease–A–Fleet*, 140 B.R. at 845 (citing *In re Zagata Fabricators, Inc. v. Superior Air Products*, 893 F.2d 624, 627 (3d Cir.1990); *In re F.A. Potts & Co.*, 137 B.R. 13, 16 (E.D.Pa.1992); *In re Leedy Mortgage, Co.*, 111 B.R. 488, 491 (Bankr.E.D.Pa.1990); *In re Grant Broadcasting of Philadelphia, Inc.*, 71 B.R. 891, 897 (Bankr.E.D.Pa.1987); *In re Patch Graphics*, 58 B.R. 743, 746 (Bankr. W.D.Wis.1986)). The court is unpersuaded by the Debtor's argument that because it subsequently used only $33,222.90 of the January 10th inventory to satisfy the individual store requests until the January 13th rejection date, the inventory delivered to the warehouse on January 10th was not beneficial to the estate. The Debtor explained to the Court during the January 9, 2001 hearing that the additional inventory was necessary to stock appropriate products on the shelves of its stores. Plainly, Grand Union believed that the inventory was necessary for optimally meeting its ongoing operational needs. The fact that the actual use of inventory did not match Grand Union's projected needs does not mean that the warehousing of the inventory was not beneficial. After all, Grand Union was able to make decisions about individual store operations based on the certitude that it had a sufficient quantity and type of inventory on hand. The Court finds that under these circumstances, the Excess Inventory claim qualifies as an administrative priority expense.

## II. *Shortfall and Repurchase Obligations*

CSI equates the debtor's rejection of the Agreement on January 13, 2001 to termination of the agreement. Accordingly, CSI contends that the debtor's rejection triggered the Repurchase Obligation set forth in the Agreement. CSI rests its contention on language in the Agreement that provides that the termination may occur "for any reason whatsoever." CSI also contends that because payment of the Shortfall would have come due on March 31, 2001, the end of the contract year, the rejection accelerated the Shortfall payment date to January 13, 2001. Therefore, CSI concludes, its right to payment for both the Shortfall and the Repurchase Obligation arose post-petition as of the Rejection Date.

In support of its argument, CSI cites to the *Avellino & Bienes v. M. Frenville Co. (In re Frenville )*, 744 F.2d 332, 335 (3rd Cir.1984) for the proposition that the threshold requirement of a claim is a "right to payment." Accordingly, CSI asserts that because its right to receive payment for the Repurchase Obligation and the Shortfall came due post-petition as of the Rejection Date, these claims must be afforded administrative priority status. In response, Grand Union contends that CSI incorrectly equates the Termination Date under the Agreement with the Rejection Date. Grand Union points out that the Rejection Date occurred prior to the scheduled Termination Date of the Agree-

ment. Thus, Grand Union argues that pursuant to 11 U.S.C. §§ 365(g) and 502(g), the Repurchase Obligation and the Shortfall can only be classified as pre-petition claims under the Bankruptcy Code.

This Court agrees with Grand Union that both the Repurchase Obligation and the Shortfall are part of CSI's rejection damages and are only entitled to be treated as pre-petition unsecured claims. Application of the *Frenville* holding does not elevate CSI's claim to administration expense status. In *Frenville*, the Third Circuit necessarily had to decide when a third party's claim for indemnity arose for purposes of determining the applicability of the automatic stay. The Third Circuit determined that the critical inquiry was whether the claimant had a right to payment and when that right to payment arose. *Id.*, at 336. The Third Circuit found that in the absence of a contractual provision a third party's indemnification or contribution claim against the debtor did not arise pre-petition because under applicable state common law a third party does not have any such rights until the contracting parties established a primary obligation to pay. *Id.* at 337. In the matter at hand, CSI's right to payment of the Repurchase Obligation and the Shortfall were established by the Agreement, which was executed pre-petition. Additionally, on March 30, 2000, several months pre-petition, Grand Union informed CSI that it was terminating the agreement effective March 31, 2001. Thus, as of the Petition Date, CSI had an unmatured right to payment with regard to both contractual obligations. Consequently, application of the *Frenville* case to the matter at hand does not yield the conclusion that either the Shortfall or the Repurchase Obligation arose post-petition.

Furthermore, CSI's argument that the Rejection Date should be treated as the Termination Date is contrary to the plain language and purpose of Bankruptcy Code § 365(g) and § 502(g). Section 365(g) provides that:

> (g) Except as provided in subsections (h)(2) and (i)(2) of this section, *the rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease—*
>
> (1) if such contract or lease has not been assumed under this section or under a plan confirmed under chapter 9, 11, 12, or 13 of this title, *immediately before the date of the filing of the petition ...*

11 U.S.C. § 365(g)(1)(emphasis supplied).

Section 502(g) addresses the priority to be afforded a rejection claim and provides that:

> (g) *A claim arising from the rejection, under section 365 of this title or under a plan under chapter 9, 11, 12, or 13 of this title, of an executory contract* or unexpired lease of the debtor *that has not been assumed shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section or disallowed under subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition.*

11 U.S.C. § 502(g)(emphasis supplied). Thus it is readily evident that the rejection of an executory contract is not a termination of that contract, but rather constitutes a breach of that contract under § 365(g)(1). *See In re Klein*, 218 B.R. 787, 790 (Bankr.W.D.Pa.1998) (citing *Enterprise Energy Corp. v. U.S. (In re Columbia Gas Sys., Inc.)*, 50 F.3d 233, 239 n. 8 (3rd Cir.1995); *Matter of Austin Development Co.*, 19 F.3d 1077 (5th Cir.1994); *In re Modern Textile, Inc.*, 900 F.2d 1184 (8th Cir.1990)).

Moreover, with regard to the Repurchase Obligation, even if the rejection of the Agreement can be considered to have fallen within the parameters of termination identified in the Agreement ("termination for any reason") the claim still arose from rejection and application of § 502(g), results in the Repurchase Obligation being treated as a pre-petition claim, not an administrative expense. *See, Baldwin,* 228 B.R. at 513 (citing *Klein,* 78 F.3d at 26; *GATX Leasing Corp. v. Airlift Int'l Inc. (In re Airlift Int'l, Inc.),* 761 F.2d 1503, 1509 (11th Cir.1985)).

■ CSI seeks to avoid the application of the plain language of § 365(g) and § 502(g) by focusing the Court's attention on cases that conclude that the rejection of the Agreement does not automatically preclude administrative status and that § 365(g) "relate[s] only to the time a claim arises, not whether the claim is to be accorded administrative priority." *See In re Woodland Corp.,* 48 B.R. 623, 625–626 (Bankr.D.N.M.1985). However, it is equally true that a claim is not afforded the status of an administration expense under § 503(b)(1) simply because an obligation came due or arose in the post-petition period. A claimant must still establish that the criteria for an administrative expense is met, because "in accordance with the policy of construing section 503(b) narrowly, 'there must be an actual, concrete benefit to the estate before a claim is allowable ...'" *Baldwin,* 228 B.R. at 513 (quoting *Broadcast Corp. of Georgia v. Broadfoot, II (In re Subscription Television of Greater Atlanta),* 789 F.2d 1530, 1532 (11th Cir.1986)).

In the cases relied on by CSI, in support of its contention that the rejection of the agreement does not preclude administrative status, the courts required that claimant meet the test for an administrative expense under § 503(b). (*See In re Mer-*

*ry–Go–Round Enters.,* 180 F.3d 149, 161–162 (4th Cir.1999) (the landlord's damages for Chapter 7 trustee's rejection of a lease entered into during the Chapter 11 were a Chapter 11 administrative expense under 503(b))); *In re Patient Educ. Media, Inc.,* 221 B.R. 97, 103 (Bankr.S.D.N.Y.1998) (debtor knowingly and willingly used premises in the pre-rejection period to preserve and maximize assets of the estate); *In re Tucci,* 47 B.R. 328, 333 (Bankr.E.D.Va.1985) ("a landlord is entitled to an administrative claim for post-petition rent for leased premises if the claim is a constituent of 'the actual, necessary costs and expenses of preserving the estate ...'").

■ As the party asserting the status of an administrative claimant CSI has the burden of proof. *Patient,* 221 B.R. at 101 (citing *In re Mid Region Petroleum, Inc.,* 1 F.3d 1130, 1132 (10th Cir.1993); *In re Drexel Burnham Lambert Group, Inc.,* 134 B.R. 482, 489 (Bankr.S.D.N.Y.1991)). "He must demonstrate that (1) his claim arose from a transaction with or on account of consideration furnished to the debtor-in-possession, and (2) the transaction or consideration directly benefitted the debtor in possession." *Id.* (citations omitted). Here, CSI has failed to prove that any portion of either the Shortfall or the Repurchase Obligation arose during the two and a half months between the filing of the petition and the rejection date while CSI continued to provide services.

Nor is this a case in which CSI should be afforded an administration expense in order to prevent unjust enrichment of the debtor's estate. In the case of *In re United Trucking Service, Inc.,* 851 F.2d 159 (6th Cir.1988) the Sixth Circuit affirmed the bankruptcy court's determination that the equipment lessor's claim for damages for repairs to certain trailers was properly treated as an administration expense. In

that matter the lease required the debtor to maintain and make repairs at its own expense. The court found that the debtor had benefitted at the expense of the creditor because the failure to maintain and repair the trailers as required by the lease allowed the debtor to use the money saved to continue its operations. *Id.*, at 162. Nothing in the record before the Court reveals that either the Shortfall or the Repurchase Obligation can be said to have arisen from Grand Union's post-petition conduct which caused it to profit at the expense of CSI. CSI seeks $891,364.34 and $3,400,837.80 for the Shortfall and Repurchase Obligation respectively. In 2 ½ months of post-petition services CSI was paid for the services it rendered, albeit not always timely. This does not demonstrate unjust enrichment of the debtor estate which constitutes a basis for treating either the Shortfall or the Repurchase Obligation as an administrative expense.

To summarize, a review of the nature of the Repurchase Obligation reveals that it does not meet the usual criteria for an administrative expense and therefore it is not entitled to administrative priority. As indicated earlier, a claimant must demonstrate that the claim arose from a transaction with or on account of consideration furnished to the debtor-in-possession and that the debtor-in-possession was thereby benefitted. *Jartran*, 732 F.2d at 587. The Repurchase Obligation did not arise from a transaction between CSI and the Debtor and it has not been proven that any consideration supporting CSI's right to payment was both supplied to and beneficial to the Debtor in the operation of its business. The Shortfall can be similarly scrutinized. Under the terms of the Agreement, Grand Union was obligated to pay the Shortfall at the end of the contract year (March 31, 2001) if it failed to reach the Minimum Volume Threshold. Like the Repurchase Obligation, the Shortfall does not meet the criteria for administrative priority. It did not arise from a transaction between CSI and the debtor-in-possession and it has not been proven that the consideration supporting CSI's right to payment was both supplied to and beneficial to Grand Union in its operations as a debtor-in-possession.

### CONCLUSION

The Shortfall and the Repurchase Obligation are pre-petition general unsecured claims under §§ 365(g) and 502(g). Any allowed claim arising therefrom shall constitute a pre-petition claim for damages. However, the Excess Inventory claim arose post-petition and was incurred at the request of Grand Union and for the benefit of the debtor's estate. Therefore the Excess Inventory is entitled to treatment as an administration expense.